UNITED STATES of America,
Plaintiff-Appellee,

v.

Millard Philmore THOMPSON,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

George Wilbur HAMMOND,
Defendant-Appellant.

Nos. 75–1933, 75–1934.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 15, 1975.

Decided April 22, 1976.

Norman L. Zemke, Zemke & Lustig, Southfield, Mich., for defendant-appellant Millard Philmore Thompson.

S. Allen Early, Jr., Detroit, Mich., for defendant-appellant George Wilbur Hammond.

Ralph B. Guy, Jr., U. S. Atty., Robert D. Sharp, J. Brian McCormick, Detroit, Mich., for plaintiff-appellee.

Before WEICK and McCREE, Circuit Judges, and CECIL, Senior Circuit Judge.

CECIL, Senior Circuit Judge.

Millard Philmore Thompson and George Wilbur Hammond, Defendants-Appellants, herein, appeal from their convictions in the United States District Court for the Eastern District of Michigan, Southern Division, on a charge of conspiracy to violate Section 841(a)(1) of Title 21 U.S.C.

The appellants were named in a one count indictment with five other defendants, alleged to be co-conspirators. One Franklin D. Westbrook was named as a co-conspirator but not indicted. It is alleged that the appellants and their co-defendants agreed to knowingly and unlawfully possess with the intention to distribute and to sell and distribute various quantities of heroin and cocaine, controlled Narcotic Drug Substances, Schedules I and II, respectively. The conspiracy is alleged to have extended from February 8, 1974 to February 21, 1974. Overt acts charged against these appellants are:

"1. On or about February 8, 1974, Millard Thompson placed a telephone call to Franklin D. Westbrook at Los Angeles, California."

"11. On or about February 21, 1974, Millard Thompson, George W. Hammond and Sonja Brown arrived at Room 615 located at the Howard Johnson Motor Inn, Detroit, Michigan;"

The appellants were tried jointly with Frederick J. Hammond and Sonja Brown. Defendant Marian Joan Lewis one of the indicted co-conspirators was dismissed before trial. A mistrial was declared for Frederick J. Hammond in the midst of the trial because of illness. Sonja Brown was convicted but is not included in these appeals.

The issues presented on these appeals are:

(1) whether there was evidence of a conspiracy to possess with the intention of distributing drugs or merely some attempted sales of narcotics and (2) whether certain monitored telephone calls were admissible in evidence.

Franklin D. Westbrook, the unindicted co-conspirator, lived in Los Angeles and on several occasions had brought narcotics to Detroit for illegal distribution and sale. His source of supply was Clarence Allen, also a resident of Los Angeles and one of the indicted co-conspirators. On February 21, 1974, as Westbrook deplaned in Detroit on one of his trips from Los Angeles to distribute narcotics he was arrested by David Cigich, Special Agent of the Drug Enforcement Administration. His luggage was searched and it was found to contain twenty-two pieces (ounces) of heroin and five pieces (ounces) of cocaine. Westbrook agreed to cooperate with the Drug Administration Agents and plans were set up to involve his prospective customers in criminal narcotics violations of the law.

Westbrook was a long time friend of appellant Thompson and had at one time lived in the home with Thompson and his mother. On February 8, 1974, Thompson called Westbrook in Los Angeles and discussed with him the subject of bringing some narcotics to Detroit for distribution. West-

brook went the same day to see Allen and arranged to get a supply of heroin and cocaine to be distributed in Detroit. Following this a "runner" for Allen brought to Westbrook's apartment twenty-two pieces of heroin and five pieces of cocaine.

Then on or about February 12th, Westbrook flew to Detroit with a quantity of narcotics for distribution. It is not quite clear from the evidence whether he had ten pieces of heroin or the twenty-two pieces of heroin and five pieces of cocaine he had received from Allen's runner. Upon his arrival in Detroit he checked into the Caribe Motel on Woodward Avenue. He contacted George Lowry, one of the indicted co-conspirators who came over and got one ounce of heroin.

On Saturday morning of the week of this trip Westbrook called Thompson and told him he was in town. He then took a cab and met Thompson at his residence. Thompson telephoned appellant George Hammond who came to the Thompson residence and purchased some heroin. Hammond on this occasion purchased two or three pieces of heroin from Westbrook for which he paid $1000 each and then left.

After George Hammond left, Thompson and Westbrook left in a car in search of Frederick Hammond another prospective customer and an indicted co-conspirator. They found him in his automobile along with George Lowry, on Maplewood near Grand River Ave. All four men proceeded to Fred Hammond's apartment where Westbrook sold him five or six pieces of heroin for approximately six thousand dollars. Westbrook went back to Los Angeles on Sunday evening.

On his return to Los Angeles he had approximately $11,000 which he took to co-conspirator Clarence Allen and received his "payoff" of one thousand dollars. On Monday or Tuesday evening following this return Westbrook had a telephone call from Fred Hammond. The substance of this conversation was that he wanted to deal directly with Westbrook and did not want to be involved with George Lowry as a third par-

ty. He also wanted to know when he would return to Detroit and urged him to bring as much (drugs) as he could. It is noted that the trial judge sustained an objection to this conversation as to George Hammond.

Westbrook also had a telephone call from Thompson at about the same time in which Thompson indicated that he was interested in some drugs. The trial judge overruled objections to this conversation on behalf of the Hammonds but maintained his ruling as to Sonja Brown. After these phone calls, Westbrook went to Clarence Allen's house and discussed with him the amount of drugs he had available for another trip to Detroit. He had twenty-two pieces of heroin and five pieces of cocaine. The trial judge admitted this conversation without limitation.

Westbrook flew to Detroit with this quantity of drugs and arrived there on the morning of February 20 or 21st. On his arrival in Detroit he was arrested as has been previously stated. Upon his arrest he made telephone calls to Thompson and Fred Hammond to tell them that he was in town and had some drugs for distribution. These calls were monitored by Special Agents of the Drug Administration. Westbrook checked into the Howard Johnson Motel and made further monitored calls to Thompson and Fred Hammond. In these calls he told them where he was and told them to come on down.

Objections were made on behalf of the Hammonds and Thompson to the admission of the conversations on these telephone calls. The trial judge overruled these objections and held that at this point there was evidence of a conspiracy between the Hammonds, Thompson and Westbrook. He held that the transactions Westbrook had with the Hammonds on his visit of February 13th, with the aid of Thompson, was evidence from which an agreement to violate the narcotic laws could be inferred.

As a result of these telephone conversations two groups of persons came to the Motel to meet Westbrook. Joe Gordon, a Special Agent of the Drug Enforcement Administration was in the room with West-

brook as he interviewed these groups of people. He was introduced as one traveling with Westbrook because he was carrying large amounts of drugs and he needed someone to back him up. There were also Special Agents of the Drug Administration in a room adjoining the room in which Westbrook was located.

The first prospective customers to visit Westbrook in the Motel were Fred Hammond and his friend Marian Lewis, an indicted co-conspirator. A discussion, in which Joe Gordon participated was had concerning the purchase of drugs, the price and the quality, etc. Westbrook's supply had been confiscated and there were no drugs for actual sale. When Hammond was committed to make a purchase, Joe Gordon left the room and the agents from the adjoining room came in and arrested Hammond, his friend Lewis and also Westbrook. Following the visit of this first group Thompson, George Hammond and Sonja Brown came to the motel. The conversation proceeded with each one participating concerning the purchase of narcotics, the price, the quality, etc. Joe Gordon also entered into the discussion. When these prospective customers were committed to sales Joe Gordon left the room on the pretence of getting the drugs. The Agents in the adjoining room moved in, arrested the three customers and confiscated the money.

The question thus presented on these facts is whether there is evidence, considered in its light most favorable to the government[1] from which the jury could find the existence of a conspiracy agreement. It is for the jury to determine whether this evidence meets the requirement of proof beyond a reasonable doubt.

■ The essential elements of conspiracy are:

1. The conspiracy described in the indictment was willfully formed, and was existing at or about the time alleged;

2. The accused willfully became a member of the conspiracy;

3. One of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment, at or about the time and place alleged; and

4. Such overt act was knowingly done in furtherance of some object or purpose of the conspiracy, as charged.

*Bradford v. United States,* 413 F.2d 467, 470 (5th Cir.), *United States v. Friedman,* 445 F.2d 1076, 1084 (9th Cir.) cert den., sub nom. *United States v. Jacobs,* 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275. See also *United States v. Bostic,* 480 F.2d 965, 968 (6th Cir.).

■ The existence of a criminal conspiracy need not be proven by direct evidence, a common plan may be inferred from circumstantial evidence. *Glasser v. United States, supra. United States v. Luxenberg,* 374 F.2d 241, 250 (6th Cir.), *United States v. Levinson,* 405 F.2d 971, 985 (6th Cir.) cert. den., 395 U.S. 958, 80 S.Ct. 2097, 23 L.Ed.2d 744, *United States v. Norton Van Hee,* 531 F.2d 352 (6th Cir. 1976). The trial judge correctly instructed the jury on the law of conspiracy and no issue is presented concerning the instructions to the jury.

Section 841(a)(1) 21 U.S.C. the subject of this conspiracy charge, so far as applicable to this case reads as follows:

"(a) Except as authorized by this title, it shall be unlawful for any person knowingly or intentionally * * *

(1) to manufacture, distribute, or dispense or possess with intent to manufacture, distribute, or dispense, a controlled substance; * * *"

Section 846, 21 U.S.C. defines the crime of conspiracy as "any person who attempts or conspires to commit any offense defined in this title * * *."

■ The evidence of Thompson's call to Westbrook in Los Angeles on February eighth with reference to bringing narcotics to Detroit for distribution and sale is not in dispute and is proof of one of the overt acts charged in the indictment. As indicated in

1. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

the statement of facts herein Westbrook came to Detroit in response to this call and with Thompson's assistance had transactions of drug sales with George and Fred Hammond.

We conclude from these transactions, as did the trial judge, that there was sufficient evidence from which the jury could infer and find beyond a reasonable doubt that there was an agreement on the part of these appellants to violate Section 841(a)(1), 21 U.S.C. Clearly, the object of the agreement was to sell and distribute drugs, controlled substances, in the Detroit area, illegally. The appellants were willing participants in the concerted plan of operation and performed acts in furtherance of its accomplishment.

Both of the appellants, herein, claim that the conspiracy, if any existed, came to an end with the arrest of Westbrook and that the trial judge erred in admitting into evidence the monitored telephone conversations between Westbrook and Thompson.

The trial judge ruled that up to the point of the arrest of Westbrook there was sufficient evidence from which the jury could find beyond a reasonable doubt that there was a conspiracy. In reference to the monitored telephone conversations he held that while the general rule was that the arrest of a conspirator terminated the conspiracy, it did not apply to Thompson and Hammond in this case. They were still able to continue the object of the conspiracy and the conspiracy would not end as to them until they were arrested. Their practice and business of selling narcotics on the street did not depend on Westbrook for their supplies and there is no reason to believe that they would not have found another source of supply.

In *United States v. Register*, 496 F.2d 1072, 1079 (5th Cir.) cert. den., 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 819, the court said:

" * * * if co-conspirators still at large are fully capable of perpetuating an on-going conspiracy, it is entirely possible that they or their arrested brethren may make statements intended to further effectuate the conspiracy."

See also *United States v. Sarno*, 456 F.2d 875, 878 (1st Cir.).

" * * * the termination of a conspiracy generally is an issue to be determined on the facts of the individual case, and we know of no per se rule that the arrest of one conspirator automatically terminates the conspiracy. (Citations omitted). It may frustrate it, or cause the remaining conspirators to abandon it, but where the plot is an ongoing one which is capable of being carried out in the absence of the apprehended party, his arrest no more terminates the conspiracy than would his withdrawal, incapacitation or death. In the instant case, the conspirators were capable of carrying out their scheme without Taft."

In *United States v. Cohen*, 197 F.2d 26, 29 (3rd Cir.), the court found that the fact of an arrested conspirator making contracts with other conspirators under the direction and surveillance of government agents to obtain evidence against the co-conspirators did not terminate the conspiracy or change the status of the remaining members.

The trial judge instructed the jury with reference to statements made by a member of the conspiracy as follows:

" * * * whenever you find beyond a reasonable doubt from the evidence in the case that a conspiracy existed, and that a defendant was a member of the conspiracy, then the statements thereafter knowingly made and the actions thereafter knowingly done by any person who likewise is found to be a member of the conspiracy may be considered by the jury as evidence in the case as to the defendant found to be a member, even though the statements and actions may have occurred in the absence and without the

knowledge of the defendant, provided such statements and actions were knowingly and done during the continuance of the conspiracy and in furtherance of some object or purpose of the conspiracy."

\* \* \* \* \* \*

"Therefore, statements of any conspirator which are not in furtherance of a conspiracy or made before its existence or after it terminates may be considered as evidence only against the person making it."

■ The trial judge properly defined conspiracy for the jury and left it to the jury to determine as a fact whether or not there was a conspiracy and if so the duration of its existence. He also properly instructed the jury on the admissibility in evidence of statements made by one of the conspirators.

■ We conclude that the monitored telephone conversations were properly admitted in evidence on the theory that the arrest of Westbrook did not per se terminate the conspiracy as to the appellants herein.

■ Counsel for appellant Hammond claims that the court erred in introducing into evidence as an exhibit the drugs that were seized from Westbrook at the time of his arrest. We find no merit to this claim.

The judgment of the District Court in finding the appellants guilty as charged in the indictment is AFFIRMED.