**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Philip E. KIRK, M.D.,
Defendant-Appellant.**

**No. 77–5325.**

United States Court of Appeals,
Sixth Circuit.

Argued April 12, 1978.

Decided Sept. 22, 1978.

Rehearing and Rehearing En Banc
Denied Oct. 20, 1978.

Certiorari Denied Dec. 11, 1978.
See 99 S.Ct. 726.

Frank E. Haddad, Jr., Louisville, Ky., for defendant-appellant.

Albert Jones, U. S. Atty., James H. Barr, Louisville, Ky., John J. Loftus, Appellate Section, Crim. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before KEITH and MERRITT, Circuit Judges, and CECIL, Senior Circuit Judge.

CECIL, Senior Circuit Judge.

This is an appeal by Philip E. Kirk, appellant, from his conviction before a jury in the United States District Court for the Western District of Kentucky at Louisville on forty eight counts of an indictment charging him with violations under Sections 841(a)(1) and 846, Title 21, U.S.C. and Section 2, Title 18, U.S.C. The appellant was sentenced to five years imprisonment on each of the forty eight counts for which he was convicted, the sentences to be served concurrently with each other, and to pay a total fine of $30,000. The appellant was acquitted on counts forty nine to fifty three.

The appellant claims that there is not sufficient evidence in the record to support the charge of conspiracy in the first count of the indictment.

Count one of the indictment charged that, from on or about and before May 1, 1973, until the February 1, 1977 filing of the indictment, appellant conspired with Charlene White, an employee of appellant, and Robert Forrester, a dealer of preludin and other amphetamine drugs in Louisville, Kentucky, to commit the following offenses against the United States:

"1. To unlawfully and knowingly cause others to possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1),

and Title 21(sic), United States Code, Section 2;

"2. To unlawfully and knowingly distribute and cause to be distributed controlled substances, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2;"

all in violation of Title 21, United States Code, Section 846.

According to the indictment, the conspiracy's object was to enable White, Forrester "and others to obtain controlled substances for personal use and further distribution." This object was allegedly accomplished through appellant's supplying written orders purporting to be prescriptions to White and Forrester "and others." These purported prescriptions, issued by virtue of appellant being a physician licensed to practice medicine in Kentucky with "purported medical offices" in Louisville, were allegedly "not prescriptions issued in the usual course of professional practice" and did not constitute "prescriptions of a practitioner" within the meaning of Title 21, United States Code, Section 829.

In furtherance of this conspiracy, the indictment alleged the following five overt acts:

"1. On or about January 5, 1976, in the Western District of Kentucky, the defendant, PHILIP E. KIRK, M.D., prepared a written order, purporting to be a prescription for desoxyn, a controlled substance, at the request of Reverend Father Patrick Delahanty, using the pseudonym of 'Leighton T. Creuse', and the said PHILIP E. KIRK, M.D., well knowing at the time said written order was prepared that the said Father Delahanty had no legitimate medical need for desoxyn.

"2. On or about January 9, 1976, in the Western District of Kentucky, the defendant, PHILIP E. KIRK, M.D., prepared a written order purporting to be a prescription for desoxyn, a controlled substance, at the request of Reverend Father Patrick Delahanty, using the pseudonym of 'John R. Wilson', and the said PHILIP E. KIRK, M.D., well knowing at the time said written order was prepared that the said Father Delahanty had no legitimate medical need for desoxyn.

"3. From on or about May 1, 1973, to on or about January 1, 1976, in the Western District of Kentucky, PHILIP E. KIRK, M.D., sold one Charles B. Clark written orders purporting to be prescriptions for desoxyn (*methamphetamine*), preludin (phenmetrazine hydrochloride) and other amphetamine substances.

"4. From on or about July, 1975, to on or about February 29, 1976, in the Western District of Kentucky, PHILIP E. KIRK, M.D., sold to one Robert Sheffield approximately three hundred (300) preludin (phenmetrazine hydrochloride) tablets.

"5. From on or about July 1, 1973, to on or about February 1, 1976, in the Western District of Kentucky, the defendant, PHILIP E. KIRK, M.D., sold to one Robert Forrester and his associates, their true names being unknown but using the names of 'Deborah Bryant', 'Ronald Rademacher', 'Steve Forrester', 'Michael Valuski', 'Bradley Bose', 'Floyd Keeton', and others to this Grand Jury unknown, written orders purporting to be prescriptions for an unknown quantity of preludin (phenmetrazine hydrochloride), desoxyn (*metamphetamine*) (sic) and other amphetamine and amphetamine-like drugs unknown to this Grand Jury, and that these drugs were not used for their legitimate medical purpose, but were sold illegally in the Louisville, Kentucky, area."

Appellant argues that his conviction under count one of the indictment cannot stand since there was no proof of any unlawful agreement to violate the statutes at issue, no proof of any alleged overt act committed in furtherance of any unlawful agreement, and no proof of appellant's knowing participation in any unlawful agreement. The essence of appellant's argument is that the government failed to establish conspiratorial knowledge on the part of appellant or his participation therein.

In support of this argument, appellant points out that one of the alleged co-con-

spirators, Robert Forrester, described in the indictment as "an illegal dealer of preludin and other amphetamine drugs," did not testify. In contrast, however, appellant notes that the other alleged co-conspirator, Charlene White, an employee of appellant, did testify, but testified that she did not enter into any conspiratorial agreement with appellant. Finally, with respect to appellant's argument of his lack of knowing participation in any unlawful agreement, appellant points out that he testified that he never entered into any such agreement to violate the law. While appellant concedes that certain witnesses testified they had obtained numerous prescriptions, even under assumed names, from the appellant, appellant contends that such evidence does not establish that he knowingly engaged in any conspiracy to violate the law.

As stated recently by this Court, in *United States v. Thompson*, 533 F.2d 1006, at 1009 (6th Cir. 1976),

"The essential elements of conspiracy are:
"1. The conspiracy described in the indictment was willfully formed, and was existing at or about the time alleged;
"2. The accused willfully became a member of the conspiracy;
"3. One of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment, at or about the time and place alleged; and
"4. Such overt act was knowingly done in furtherance of some object or purpose of the conspiracy, as charged."

In *United States v. Dennis Essington Green*, 548 F.2d 1261, at 1266 (6th Cir. 1977), it was stated that

"This court has long recognized that purely circumstantial evidence may be sufficient to sustain a conspiracy conviction."

Moreover, according to *Dennis Essington Green, supra*,

"The permissible inferences to be drawn from such [circumstantial] evidence need not be consonant only with an hypothesis of guilt, *U. S. v. Luxenberg*, 374 F.2d 241, 249 (6th Cir. 1967), providing that the totality of the evidence is substantial enough to support a finding of guilt beyond reasonable doubt."

See also *United States v. Van Hee*, 531 F.2d 352, at 358 (6th Cir. 1976), which declared that

"* * * the established rule of this circuit is that a finding of guilt may be based on circumstantial evidence which does not 'remove every reasonable hypothesis except that of guilt.' "

Recognizing that "purely circumstantial evidence may be sufficient to sustain a conspiracy conviction" in this circuit, this Court defines "the totality of the evidence * * substantial enough to support a finding of guilt beyond a reasonable doubt" as

"* * * more than a scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred." *U. S. v. Dennis Essington Green, supra*, at 1266, citing *U. S. v. Martin*, 375 F.2d 956, 957 (6th Cir. 1967).

The rationale of the rule that circumstantial evidence may amount to such substantial evidence to sustain a conspiracy conviction is that

"Inferential proof may be controlling where the offense charged is so inherently secretive in nature as to permit the marshalling of only circumstantial evidence. *This is the norm in drug conspiracy prosecutions* * * *" *U. S. v. Dennis Essington Green, supra*, at 1266 (Emphasis supplied)

In addition to the guidelines set out above, with respect to reviewing a conviction for conspiratorial activity, mention must be made of this Court's recognition that, as stated in *U. S. v. Dennis Essington Green, supra*, at 1266,

"Once there has been a conviction in a criminal case, appellate courts are bound to view the totality of the evidence in the light most favorable to the Government. (Citations omitted). Concomitantly, all reasonable inferences must be drawn which are consistent with the verdict. *U.*

S. v. Scales, 464 F.2d 371, 373 (6th Cir. 1972)."

See also, *United States v. Van Hee, supra,* stating that

"In testing the sufficiency of the evidence where a jury has returned a guilty verdict, we are required to view the evidence in the light most favorable to the government."

It is these evidentiary rules and considerations, therefore, which must be applied to the facts of this action to determine whether the government presented sufficient evidence to establish the four essential elements of conspiracy enumerated above.

As discussed previously, the first two essential elements of a conspiracy are that the described conspiracy exists and that the accused knowingly has participated therein. The gravamen of appellant's argument is that the government failed to establish either of these two elements. They will be treated together in this opinion in view of this Court's opinion in *United States v. Levinson,* 405 F.2d 971, at 985–986 (6th Cir. 1968), *cert. den.* 395 U.S. 958, 89 S.Ct. 2097, 23 L.Ed.2d 744 (1969), which quoted the prior opinion of *United States v. Luxenberg,* 374 F.2d 241 (6th Cir. 1967) for the following relevant propositions at issue in this case:

"Knowledge, like intent, is a factual issue which may be proved by circumstantial evidence. Whether a conspiracy exists is likewise a factual question * * * It is not fatal to the prosecution's case that it does not prove that the defendants knew or participated in every phase of the unlawful scheme. (Citations omitted.) It is only necessary that a defendant know of the conspiracy, associate himself with it, and knowingly contribute his efforts in its furtherance. (Citations omitted.) Participation in a conspiracy need not be proved by direct evidence. '(A) common purpose and plan may be inferred from a "development and co-location of circumstances." ' (Citations omitted.) It is not necessary that there be a formal agreement in order to have an unlawful conspiracy. (Citations omitted.) 'Almost al-

ways, the crime is a matter of inference, deduced from the acts of the persons accused, which are done in pursuance of an apparent criminal purpose.' " (Citations omitted.)

According to this authority, therefore neither the fact that Robert Forrester, one of the alleged co-conspirators, did not testify, nor the fact that the other alleged co-conspirator, Charlene White, testified, as did appellant, that they never entered into any conspiratorial agreement, is fatal to appellant's conviction of conspiracy under count one. As noted in the above-discussed authorities of this circuit, participation in a conspiracy need not be proved by direct evidence, conspiracy almost always being a matter of inference, deduced from the acts of the persons accused. Both the fact of the existence of a conspiracy, therefore, and an accused's knowledgeable participation therein, can be proved by circumstantial evidence. Finally, as stated in *United States v. Van Hee, supra,*

" * * * the established rule of this circuit is that a finding of guilt may be based on circumstantial evidence which does not 'remove every reasonable hypothesis except that of guilt.' "

Hence, the issue becomes whether, absent the government's producing direct evidence of an agreement to violate the statutes at issue, and absent direct evidence of appellant's knowing participation in the conspiratorial agreement, did the government produce sufficient circumstantial evidence from which the jury could have reasonably inferred such agreement and knowledge on the part of appellant.

The voluminous trial transcript in this action reveals that Richard Ross was employed as the Assistant Executive Secretary and Pharmacy Drug Inspector for the Kentucky Board of Pharmacy. In this capacity, Ross was "charged by the Board to go to all licensed pharmacies in Jefferson, Oldham and Shelby County (sic)" and to "check prescriptions files to see that they are being done according to pharmacy law * * * We even do a review of the drugs that are being dispensed in the pharmacy." Ross

testified that, in the course of his exercising these duties,

"* * * I did, in fact see drugstores that were selling * * * and again, in my opinion an unreasonable quantity of Schedule II drugs, primarily preludin, from Doctor Kirk."

Ross felt that "there were such a large quantity" of controlled drugs being dispensed pursuant to appellant's prescriptions, "that I passed this to Narcotic and Drug Control for their review." According to Ross, there were approximately 200 drug stores in Jefferson County, Kentucky, and

"you could find them (prescriptions written by appellant) most every drug store in the beginning (of the investigation). And, as I went on, there were other drug stores * * * that would choose not to honor these prescriptions."

Perhaps the most damaging portion of Ross' testimony with respect to the quantity of prescriptions issued by appellant for controlled substances was his testimony that

"* * * in regard to the numbers of prescriptions for Schedule II by other physicians, all the other physicians that were going to that pharmacy in comparison to Doctor Kirk, in many instances they were * * * up to maybe 90 percent of Doctor Kirk's that were Schedule II and the other pharmacies, then they were just less than 10 per cent."

Thus, the government did present evidence on an "unusually large quantity" of prescriptions for controlled substances issued by appellant.

In addition, there was substantial evidence presented to the effect that such prescriptions for controlled substances were issued with great frequency to the same individuals. Larry Whalen, for example, testified that he first went to appellant's office in the summer of 1975 to "get a 'script. My brother was shooting dope at the time." Whalen testified that his brother was "Shooting this dope he got from Doctor Kirk. Acutally (sic), preludin is the name of it." Prior to his initial contact with the appellant, Whalen testified that he

was getting preludin from his brother which he was selling. Whalen described the manner in which preludin could be crushed in a spoon, heated in water in the spoon, inserted into an insulin syringe and injected into the arm to obtain a type of euphoric energy.

Beginning in August 1975, Whalen testified that

"I went (to appellant's office) every day. And I usually averaged getting in and getting over about three to four times a week."

Whalen testified that he "had several different IDs" which he sometimes used to present to appellant's receptionist. With respect to this use of fictitious names and identifications, appellant himself admitted that his patients frequently used such false names but appellant maintained that he did not know that some patients frequently returned using different false names.

With respect to appellant's claimed failure to recall patients returning to his office using alternative identifications, Whalen testified, however, that

"Well, let me express it like this. You went there and Doctor Kirk more or less, not in so many words, I don't know how you would actually put it—you know, he let you know he knows you've been there several—Hell, you was just there yesterday. You know, he'd let you know."

In other words, according to Whalen, "He more or less related if you ever get busted, it's you not me."

Finally, Whalen testified that his arms had "track marks" on them "From shooting dope." According to Whalen, these marks were "readily noticeable" and appellant saw them, but continued to provide Whalen with prescriptions for the controlled drugs. When Whalen got such prescriptions from appellant, he would either "shoot the preludin" or "Sometimes I'd sell them."

Whalen eventually cooperated with law enforcement authorities in investigating appellant. With respect to these activities, Whalen testified that

"The reason for doing that was, sending me different places, they knew Doctor Kirk knew I'd been there before. And I went into Doctor Kirk's office and I sat down and this old woman (Mrs. Bevins, an employee of appellant Kirk) comes out there * * * she comes back in the Doctor's office and I'm sitting right beside the desk and she said, 'Doctor Kirk, this boy was just here yesterday.' Doctor Kirk mumbled-jumbled something—I don't know what he said. And she said, 'Yeah, that so-and-so is after those damned pills again.' * * * Doctor Kirk just laughed at her, because he kept filling it out, gave me a prescription."

Hence, this testimony indicates that, despite being apprised by one of his employees that Whalen had been in the office only the previous day seeking a prescription for drugs, appellant continued to supply Whalen with another prescription for the drugs. Whalen, incidentally, turned over possession of this particular prescription to narcotics authorities.

In addition to Whalen, Dennis Thomas testified that he had gone to appellant "about 30 or 40 times for diet pills." Thomas testified that he himself went twice a week, at which time he got prescriptions. With the pills obtained from such prescriptions, Thomas testified that he would "shoot them up." As Whalen, Thomas testified that his arms also had "track marks all over them" and that appellant had seen his arms. Appellant, nevertheless, continued to provide Thomas with prescriptions to obtain controlled drugs.

When visiting the doctor in his office twice weekly, Thomas testified that "I used my same name but different addresses." This was "because he wouldn't give them to me if I didn't."

With respect to the doctor's requirement of Thomas' use of a different address when obtaining prescriptions, Thomas testified that the doctor kept cards showing such different addresses. For $20, however, Thomas testified that you could "get it tore up."

Further, when visiting appellant's medical office, Thomas testified that he took other people with him to obtain prescriptions. Thomas used these prescriptions to obtain drugs which he would then sell, as did Whalen.

Charles Clark testified that he went to appellant "To obtain amphetamines" although he was not overweight at the time. He testified that, when he visited appellant's medical office, he had "track marks" on his arms. In addition, he observed other patients to have "track marks" on their arms. Through the prescriptions, he obtained the drugs preludin and desoxyn. For these prescriptions, Clark testified that he paid appellant $6.00. If, for some reason appellant did not give him a prescription, Clark testified that he was charged no fee. Accordingly, it seems apparent from the record that appellant's patients were paying him for the prescriptions for the drugs, not for office visits.

When asked to describe the type of people in the waiting area of appellant's office, Clark testified that
" * * * a lot of them would be either—the ones who were really into amphetamines would be fairly emaciated * * * or showing quite a bit of weight loss. You know, they would be jerky in their movements, they would be very tense. Those would be the ones who were under the influence of amphetamines at that time. The ones who weren't would be lethargic, would be standing around, you know, and just— well, basically * * * They wanted in quickly to score (obtain a prescription)."

With respect to the frequency of his visiting appellant's medical office to obtain prescriptions for the drugs, Clark testified that " * * * over the years I've been there maybe seventy times." "For a while," Clark testified that "I was going in maybe two or three times a week." Clark described the atmosphere at appellant's medical office as "just like old home week, you know, the people on the outside and the people on the inside, you knew half of them."

Patricia Burton testified that she had been twice convicted on charges of selling preludin, which pills she obtained through prescriptions from appellant. She testified that appellant never refused her any requested prescriptions. During her visits, she observed that "Every time I went there, they were the same ones (other patients) almost." During the course of her visiting appellant's medical office, Burton testified that she became good friends with Charlene White, one of the alleged co-conspirators in this case. Prior to Burton's becoming friends with White, however, Burton testified that she was required to use false names after her first few visits to the appellant to obtain prescriptions. Burton testified, however, that Charlene White assisted her in conjuring up such fictitious names. As testified by Burton,

"I used an ID when I first went there. Then a couple of times I was beginning to run out of names and addresses, and she (Charlene White) helped me make up an address a couple times, I mean, we just made up a name."

After becoming good friends with White, Burton testified that "I didn't have to use IDs then."

With respect to the frequency of her office visits, Burton testified that

"Well, I went two weeks then after I went the first two times for Miss Neeley, I went two weeks after that for myself. And I went back about another two weeks and then I started going once a week, then twice a week. One evening I went in about—he opened up about six o'clock, I was there. And then he opened up at eleven o'clock the next day, and I was there again."

Despite the proximity in time of her visits, particularly the last two described above, Burton testified that she had no difficulty in getting prescriptions from appellant. With respect to her use of the pills obtained pursuant to the prescriptions, Burton testified that "I took maybe two or three of them. I sold the rest."

Burton testified that, even after she was arrested for selling drugs, she went back to the appellant's office for prescriptions four or five times. At this point, Burton testified that

" * * * (Charlene White) told me that I was going to have to stop coming in, you know, things were hot and I didn't want to get Doctor Kirk in trouble and she didn't want to get in no trouble and that I couldn't afford any more trouble."

With respect to the cards about his patients which appellant kept, Burton testified that

"(Charlene White) told me one day that I called her at home that they (police narcotic detectives) had been in that day and that the heat was on and things was going to have to slow down a little bit and for me not to worry, that all my cards was taken care of where I went in under different names, that they had all these taken out of the file."

Richard Hise, a detective with the Jefferson County, Kentucky Police Department, testified that his duties included being assigned to the Narcotics Section of the County Police Department. In the performance of these duties, he participated in an investigation of appellant in an undercover capacity beginning in April, 1975. Hise's assignment was to make purchases of drugs from individuals who were dealers, obtain information about these drug cases, prepare evidence about the cases, and record the evidence for later testimony in court action.

During his investigation, when making such purchases, Hise testified that he "learned on the street * * * that instead of buying from individuals and paying a higher price that I could go down and possibly get into the Doctor's office, get a prescription for the preludin and not have to pay the high street price * * * " Accordingly, Hise made contact with individuals selling drugs on the street and went with them to appellant's office. The dealers would then sell the pills to Hise which they obtained at the pharmacy through prescriptions issued them by appellant.

Hise testified that, in 1975, he himself visited appellant's office in an attempt to

be admitted as a patient " * * * after I became, apparently became, known down there. I didn't realize it at the time." His attempt was foiled, however, when Charlene White recognized his false identification as the name of a person Hise had used at appellant's office on occasion. Hise later discovered next to the fictitious name on an index card kept by appellant was written in red letters "Do Not admit, Narc."

The foregoing excerpts of evidence presented in the trial court include sufficient evidence to support appellant's conviction of conspiring to "cause others to possess with intent to distribute controlled substances," and to "knowingly distribute and cause to be distributed controlled substances" in violation of 21 U.S.C. § 841(a)(1). As stated previously, the fact of a conspiratorial agreement may be properly inferred from circumstantial evidence. Such circumstantial evidence in this action consists in the large quantities of controlled substances dispensed pursuant to prescriptions issued by appellant, the frequency with which he issued such prescriptions, and the repeated issuance of such prescriptions to the same individuals, even individuals with visible "track marks" on their arms. There was also testimony to the effect that appellant required his repeat patients to use different names and/or different addresses for purposes of appellant's medical records, and that such records could be destroyed at the request of a patient, if he paid a fee. This testimony, together with the testimony relative to appellant's employee, Charlene White, taking precautions to avoid allowing narcotic detectives to see appellant, is supportive of an inference of a conspiratorial agreement.

Similarly, appellant's knowledge that such controlled substances were being redistributed by his "patients" could be reasonably inferred from these factors. Simply stated, appellant must have known that the individuals to whom he issued such frequent prescriptions, could not be using such large quantities of drugs for their own medical welfare. In addition, in appellant's supplying controlled substances to patients with "track marks", the jury might reasonably

have inferred that appellant knew his patients were selling the excess drugs to support any narcotic addiction they might have. From these factors, the jury could have inferred appellant's intent to violate the statutes at issue. Further, the evidence that appellant issued a prescription to Whalen, despite the protestations set out above of his employee, Mrs. Blevins, also lends itself to the reasonable inference that appellant knowingly and intentionally participated in a conspiracy to distribute controlled substances.

In addition, the jury could have reasonably inferred the existence of a conspiratorial agreement from evidence presented with respect to the actions of Charlene White, appellant's receptionist and alleged co-conspirator. This evidence, as discussed above, indicated that White assisted persons in conjuring up fictitious names, that she warned known narcotic dealers not to come to appellant's office when "things were hot," and that she destroyed medical records of patients' visits for a fee. While it is arguable that none of this evidence directly established an agreement between her and appellant, the employer/employee relationship existing between them in addition to her actions discussed above, including her refusal to admit to appellant's office one known by her to be a narcotics agent, support the opposite conclusion.

■■ As discussed previously, in testing the sufficiency of the evidence to support a jury verdict of guilty, a reviewing court is required to view the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Van Hee, supra.* Moreover, as discussed previously, the established rule of this circuit is that a finding of guilt may be based on circumstantial evidence which does not "remove every reasonable hypothesis except that of guilt." *United States v. Van Hee, supra*, at 358. See also *United States v. Dennis Essington Green, supra*, at 1266, stating "the permissible inferences to be drawn from such evidence need not be consonant only with an hypothesis of guilt."

■ With respect to appellant's argument that "overt acts alleged in the conspiracy count were not proven," it is noted that this circuit requires only that "at least *one* of the overt acts charged in the indictment" be committed by one of the conspirators. *United States v. Thompson*, 533 F.2d 1006, 1009 (6th Cir. 1976). As to the overt acts charged in the indictment, appellant concedes in his brief that Father Delahanty received three prescriptions from appellant. And, as discussed previously herein, Charles Clark testified that he received numerous prescriptions from appellant. (See Overt Act No. 3 in the indictment.) Appellant also concedes that Robert Sheffield testified that he had received prescriptions for controlled substances from appellant. (See Overt Act No. 4 in the indictment.)

Hence, with respect to the sufficiency of the evidence to support appellant's conviction by jury of conspiring to violate certain narcotic statutes, this case falls within the following language of *U. S. v. Dennis Essington Green, supra,* at 1266:

"Inferential proof may be controlling where the offense charged is so inherently secretive in nature as to permit the marshalling of only circumstantial evidence. *This is the norm in drug conspiracy prosecutions * * * *"* (Emphasis supplied)

■ We conclude that there is sufficient evidence in the record to support the verdict of the jury, guilty of conspiracy as charged in the first count of the indictment. We affirm the conviction on this count with its sentence of five years imprisonment and $3,000 fine.

The appellant claims that there was not sufficient evidence to support the convictions on charges contained in the substantive counts two through forty eight. Each of counts two through forty eight charged appellant with having caused the distribution of a controlled substance by issuing a written order, purporting to be a prescription, for a named individual, not in the usual course of professional practice or for legitimate medical or research purpose, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Appellant first argues that his convictions on the charges contained in counts two through forty eight are unsupported by sufficient evidence because

"the record does not reveal any relevant evidence as to the * * * crucial element 'not in the course of professional practice or for a legitimate medical reason.'"

Appellant points out that he testified from his office records that he had only written prescriptions for patients in the course of professional practice and for legitimate medical reasons. According to appellant, the only persons who could have established to the contrary were those individuals named in the various counts at issue as having been issued the prescriptions not in the course of appellant's professional practice or for a legitimate medical reason.

In this regard, appellant points out that the prosecution does not present any testimony from the following persons: "Roy Rogers" named in counts two and three as having been wrongfully issued a prescription by appellant; "Joe Price," named in counts four and five; "Mrs. Carmen Price," named in counts six, seven and eight; "Gerald Murphy," named in counts thirteen, fourteen and fifteen; "Harry Houchins," named in counts sixteen, seventeen and eighteen; "Kermit Caswell," named in counts nineteen, twenty, twenty one and twenty two; "Joseph Moore," named in counts twenty three, twenty four, twenty five and twenty six; "Patsy Lepard," named in counts twenty seven, twenty eight and twenty nine; "Mike Lewis," named in counts thirty and thirty one; "Jim Lewis," named in counts thirty two, thirty three,[1] thirty four, thirty five, thirty six, thirty seven, thirty eight, thirty nine and forty; "Dan Crump," named in counts forty one, forty two, forty three and forty

---

1. Count thirty three names "Jas. Lewis" as having wrongfully been issued a prescription. Apparently a typographical error is involved.

four; "Danny Crump," named in counts forty five, forty six, forty seven and forty eight.

The prosecution, however, did present Larry Craig who was named in counts nine, ten, eleven and twelve as having been wrongfully issued prescriptions on specific dates for preludin (counts nine, ten and eleven) or for desoxyn (count twelve) which prescriptions were not issued in the usual course of appellant's professional practice or for a legitimate medical or research purpose. According to appellant, however, Craig's testimony only " * * * demonstrates that the treatment of the witness Craig was for a legitimate medical reason, that it (sic), weight control."

Craig testified that he first saw appellant in early 1975 and last saw him in the summer of 1976. During this period of time, Craig testified that he saw appellant 25 or 30 times at intervals of 2 or 3 times a month. None of these visits, according to Craig, was for consultation with appellant for a legitimate medical problem. Craig testified that "I just didn't trust him for personal medicine, at least." Instead, Craig testified that he saw appellant to obtain prescriptions for "speed."

When Craig first began seeing appellant, he testified that appellant's receptionist was an "older woman" named Pearl. Craig testified that he "told her I wanted to see the doctor so I could lose some weight." He would then wait for long periods of time among other individuals waiting to see the appellant. Craig testified that these other individuals "looked like hippies, you know, long hair, old ragged jeans, stuff like that, most of them." With respect to the type of examination given him at these office visits, Craig testified that the receptionist " * * * usually took my weight and then the doctor would take my blood pressure and that was about all I can remember, just the weight and the blood pressure." Other than that, Craig testified that the doctor did nothing but "tell me what I could and couldn't eat." In this regard, Craig testified that appellant told him " * * * to stay off of stuff like beer and highballs,

pizzas, spaghetti, starch foods, stuff like that."

According to Craig, however, appellant never checked his heart, never asked Craig about the nature or extent of his weight problem, never asked Craig if he had a history of heart trouble or of thyroid disease, and never warned Craig of the dangers of drugs prescribed by him. Nor, according to Craig, did appellant ever ask him about Craig's allergies in general, or, in particular, whether Craig had any allergy to any type of medication.

Despite this, however, Craig testified that appellant would give him his choice of drugs from among preludin, desoxyn or eskatrol. Craig testified that after he told appellant "I wanted preludin," appellant would "Write me out a script for preludin." On each occasion when Craig received a prescription from appellant, Craig testified that appellant's fee was $6.00. If he did not, for some reason, obtain a prescription during one of his office visits, Craig testified that he did not have to pay appellant any money.

Craig testified that, on one occasion, appellant "did look at the (height-weight) chart once and turned me down * * * " During this office visit, Craig testified that appellant "told me that in order to get the prescription, I would have to—I would have to be overweight * * * " Accordingly, Craig testified that he thereafter returned to appellant's office wearing plastic ankle weights, in order to weigh enough according to the height-weight chart, in order to appear overweight. Craig denied ever having told appellant or his receptionist about wearing these weights in order to obtain any prescription. In addition to this use of ankle weights, Craig testified that "Once or twice" he used the name "Joe Mason" during an office visit to obtain a prescription for the controlled drug.

Four particular prescriptions were shown by the prosecution to Craig who testified that "I'm pretty sure those are my prescriptions." He identified the prescriptions as ones he had received from the appellant. These four prescriptions formed the basis

for the prosecution in counts nine, ten, eleven and twelve as having been wrongfully issued to Craig by appellant not in the usual course of professional practice or for a legitimate medical or research purpose, in violation of 21 U.S.C. § 841(a)(1).

Paul Johnstone, a Compliance Investigator for the United States Department of Justice Drug Enforcement Administration, identified each of the four prescriptions as ones which he had inspected and removed from the prescription files of drugstores during an investigation of appellant's writing prescriptions for the drugs preludin and desoxyn. During the period of May 1, 1973 until May 25, 1976, Johnstone testified that the investigation revealed appellant had issued 5,373 prescriptions for preludin which were taken to these drugstores, and 1,827 prescriptions for the drug desoxyn.

Two of the essential elements of the substantive counts from two to forty eight are: The prescriptions issued by the appellant to various persons must have been "not in the usual course of professional practice" and "not for a legitimate medical or research purpose."

It has been held that there is no difference in the meanings of the statutory phrase, "In the usual course of professional practice" and the regulations' phrase, "legitimate medical purpose." *U. S. v. Plesons*, 560 F.2d 890, 897 (8th Cir. 1977); *U. S. v. Rosenberg*, 515 F.2d 190, 197 (9th Cir. 1975), *cert. den.* 423 U.S. 1031, 96 S.Ct. 562, 46 L.Ed.2d 404.

Sec. 841(a)(1), 21 U.S.C., of which appellant was charged with violating, provides that,

"Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally (1) to * * * distribute * * * a controlled substance."

Sec. 1306.04(a), 21 C.F.R. provides,

"A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, * * * *"

The burden of proof is upon the government to prove these elements. *United States v. Black*, 512 F.2d 864, 867 (9th Cir. 1975); *United States v. Clifford T. Green, et al.*, 511 F.2d 1062, 1069, 1072 (7th Cir. 1975), *cert. den.* 423 U.S. 1031, 96 S.Ct. 561, 46 L.Ed.2d 404; *United States v. Carroll*, 518 F.2d 187, 189, 207 (6th Cir. 1975).

While physicians are exempt from the provisions of the drug abuse statutes when they dispense or prescribe controlled substances in good faith to patients in the regular course of professional practice, they are liable to prosecution under Sec. 841, 21 U.S.C. " * * * when their activities fall outside the usual course of professional practice." *U. S. v. Moore*, 423 U.S. 122, 124, 96 S.Ct. 335, 337, 46 L.Ed.2d 333 (1975). See also *U. S. v. Rosenberg*, 515 F.2d 190 (9th Cir. 1975), *cert. den.* 423 U.S. 1031, 96 S.Ct. 562, 46 L.Ed.2d 404 (1976); *U. S. v. Ellzey*, 527 F.2d 1306 (6th Cir. 1976).

No reported decision sets out specific guidelines of what is required to support a conclusion that an accused acted outside the usual course of professional practice in issuing prescriptions for controlled substances. The decisions reflect a case by case analysis of evidence to determine whether a reasonable inference of guilt may be drawn from specific facts.

The Supreme Court in *U. S. v. Moore, supra*, at 143, 96 S.Ct. at 345, said,

"The evidence presented at trial was sufficient for the jury to find that respondent's conduct exceeded the bounds of 'professional practice.' (Footnote omitted.) As detailed above, he gave inadequate physical examinations or none at all. He ignored the results of the tests he did make. He did not give methadone at the clinic and took no precautions against its misuse and diversion. He did not regulate the dosage at all, prescribing as much and as frequently as the patient demanded. He did not charge for medical services rendered, but graduated his fee according to the number of tablets desired. In practical effect, he acted as a large-scale 'pusher'—not as a physician."

One or more of the foregoing factors, or a combination of them, but usually not all of them, may be found in reported decisions of prosecutions of physicians for issuing prescriptions for controlled substances exceeding the usual course of professional practice. Consider the testimony of Larry Craig in the light of this quotation from the Supreme Court. In determining the standard of practice of the appellant, the jury had a right to consider all of the evidence before the court bearing on the subject.

In addition to the testimony of Larry Craig, and other witnesses as hereinbefore stated, the government presented expert testimony of two physicians, Dr. Wm. P. Von der Haar and Dr. Lawrence Green, part of whose testimony was relative to the issue of the generally acceptable standards of medical practice for issuing prescriptions for the drugs preludin or desoxyn for the treatment of obese patients. Such testimony as to the traditional procedures and techniques followed by physicians is entirely permissible. See, e. g., *U. S. v. Clifford T. Green, et al., supra,* at 1073, cert. den. 423 U.S. 1031, 96 S.Ct. 561, 46 L.Ed.2d 404; *U. S. v. Davis,* 564 F.2d 840, at 845 (9th Cir. 1977), *cert. den.* 434 U.S. 1015, 98 S.Ct. 733, 54 L.Ed.2d 760 (1978); *U. S. v. Bartee,* 479 F.2d 484, at 488 (10th Cir. 1973).

In essence, the doctors testified that at a minimum, a medical history should be taken from each patient, a physical examination given and certain laboratory tests performed when indicated, before any physician should issue any prescription for the drugs. They testified about the importance of ascertaining from the patient the nature and extent of the patient's supposed weight problem in addition to the importance of questioning the patient about any allergies in general or to specific medication to eliminate the possibility of any adverse reaction to a prescribed drug. The importance of learning about any medications being currently taken by the patient was stressed since appetite suppressants in combination with other drugs could produce an adverse reaction such as fatal high blood pressure, grand mal epileptic seizure or insulin reaction in diabetics. In addition, knowledge of whether the patient has had a history of heart trouble should be obtained by the physician since the drugs could cause a fatal stroke or heart attack. And whether or not the patient has a history of thyroid disease should be learned since, if the patient should have a "low thyroid" the drugs would not affect the obesity, and if the patient had hyperthyroidism, the drugs would tend to cause additional problems such as an elevated blood pressure.

The doctors also testified about the importance of advising the patients of the dangers of the drugs, particularly if the prescribed dosage were altered. Possible side effects of the drugs identified by the doctors included severe disruptions of the gastro-intestinal tract, severe skin rashes, heart attacks and hallucinations, or psychotic or homicidal reactions.

Dr. Green was asked whether "* * * in the treatment of obese patients, would the mere weighing of the patient, the taking of the blood pressure of the patient and the referral to a diet chart, would that be within the generally accepted medical practice in the treatment of obese patients?"

Dr. Green replied:

"No, I'd say that would fall far below the minimum that would be necessary."

Four physicians, Arthur Hurst, F. G. Plymale, Norvin Casper, and Ben Reid testified on behalf of the appellant. Three of these doctors testified that appellant's reputation for honesty and good moral conduct was good. One doctor testified that he did not know that the Jefferson County Medical Society had instituted disciplinary proceedings against the appellant. One other doctor said he had heard of the disciplinary proceedings. With *qualifications* all four doctors approved the appellant's standard of medical practice.

This conflict in medical testimony presented questions of fact for the jury to determine. This testimony was sufficient from which the jury could have drawn inferences that the issuance of prescriptions

for controlled drugs was not in the usual course of professional practice or for a legitimate medical or research purpose.

We conclude from all the evidence in the record pertinent to counts nine, ten, eleven and twelve, that it is sufficient from which the jury could have reasonably inferred that the appellant was guilty as charged.

In *United States v. Dye*, 508 F.2d 1226, 1231 (6th Cir. 1974) *cert. den.* 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975), we said,

"It is well settled in this jurisdiction that it is not necessary that circumstantial evidence remove every reasonable hypothesis except that of guilt." (See also *United States v. Van Hee, supra.*)

In addition to the 5-year concurrent prison terms on these counts, the district judge assessed a fine of $3,000 on each count.

We affirm the convictions on these counts.

We have previously indicated that there is sufficient evidence from which the jury could infer that the appellant issued prescriptions, to individuals for controlled substances, not in the course of professional practice or for a legitimate medical or research purpose. These are elements of substantive counts two through forty eight, inclusive. Another essential element in these counts is that a prescription was issued to a specific person in each count, unlawfully and knowingly for the purpose of distributing controlled substances as classified by Section 812, 21 U.S.C.

The appellant claims that the convictions on counts two through eight and thirteen through forty eight should fail for the reason that the persons alleged to have received the prescriptions did not testify. Paul Johnstone, a Compliance Investigator for the United States Department of Justice, Drug Enforcement Administration, testified that he had gathered prescriptions from pharmacies to which appellant's patients had taken them. He testified that the prescriptions which he identified and which were introduced as exhibits related to the respective counts of the indictment returned by the grand jury.

Mr. Johnstone identified prescriptions purporting to have been issued by the appellant as follows: To Roy Rogers on November 11, 1975 and December 12, 1975, counts two and three; to Joe Price on January 7, 1976 and March 1, 1976, counts four and five; to Mrs. Carmen Price on January 5, 1976, February 6, 1976 and March 10, 1976, counts six, seven and eight. (Counts nine, ten, eleven and twelve have been previously discussed.) To Gerald Murphy, November 14, 1975, December 15, 1975 and February 14, 1976, counts thirteen, fourteen and fifteen; to Harry Houchins on January 28, 1976, May 16, 1975, April 16, 1975, counts sixteen, seventeen and eighteen; to Kermit Caswell on March 9, 1975, count nineteen; to Mrs. Kermit Caswell on August 18, 1975 and May 22, 1976, counts twenty and twenty one;[2] to Kermit Caswell on May 25, 1975, count twenty two; to Joseph Moore on May 11, 1974, to Joseph Allen Moore on April 12, 1975, to Joseph Moore on November 4, 1974, to Joseph Allen Moore on June 2, 1975, counts twenty three, twenty four, twenty five and twenty six; to Patsy Lepard on April 23, 1975, May 25, 1975 and June 30, 1975, counts twenty seven, twenty eight and twenty nine; to Michael Lewis on December 3, 1973, to James Mike Lewis on January 11, 1974, counts thirty and thirty one; to Jim Lewis on February 8, 1974, to James Lewis on February 15, 1974, to Jim Lewis on March 8, 1974, March 8, 1974, to James Lewis, January 24, 1976, October 8, 1975, September 2, 1975, June 7, 1975 and April 26, 1975, counts thirty two, thirty three, thirty four, thirty five, thirty six, thirty seven, thirty eight, thirty nine and forty; to Dan Crump on May 14, 1973, August 1, 1973, October 19, 1973, November 30, 1973, January 11, 1974, February 11, 1974, March 23, 1974 and June 12, 1974, counts forty one, forty two, forty three, forty four, forty five, forty six, forty seven and forty eight.

---

**2.** The indictment charges that in counts twenty and twenty one the prescriptions were issued

to Kermit Caswell. Mr. Johnstone testified that they were issued to Mrs. Kermit Caswell.

These prescriptions were all issued on the prescription blanks of the appellant.

Appellant admitted that he had issued the following prescriptions but claimed that he had issued them for a legitimate medical purpose: four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, seventeen, eighteen, nineteen, twenty, twenty one, twenty two, twenty four, twenty five, twenty six, twenty seven, twenty eight, twenty nine, thirty two, thirty six, thirty seven, thirty eight, thirty nine and forty.

As to counts two, three, twenty three and thirty three, he said, "I don't believe it is (my signature) but I can't guarantee it." Counts thirty and thirty one, the appellant testified: "These are close. I wouldn't * * I'd hesitate to say (whether these are my genuine signatures) on these." With reference to counts thirty four and thirty five, he testified: "I can't be definite on these two."

Concerning the prescriptions involved in counts forty one through forty eight alleged in the indictment to have been issued to Dan Crump, he testified that:

"We were not able to find a Dan Crump. And my girl went through the registry, and we found that he had been in three or four times, but all the rest of them, there was no record of him even being in."

Appellant made no specific denial with respect to counts forty two, forty seven and forty eight.

Appellant testified with reference to the following prescriptions:

Forty three, "I don't think" I issued that prescription.

Forty four, the prescription "looks pretty good."

Forty five, "I'm skeptical of" its being my writing.

Forty six, "I don't think" it is my writing on the prescription.

There is some evidence by the appellant that some of the prescriptions were forged on a prescription pad stolen from his office. We consider this matter subsequently in this opinion.

We conclude that there is ample evidence from which the jury could find that the appellant issued prescriptions to the specific persons named in counts two to forty eight inclusive and that they were not issued in the usual course of professional practice or for a legitimate medical or research purpose.

The trial judge assessed a fine of $3,000 against the appellant in each of counts two, three, five, thirteen and fourteen.

In addition to affirmances heretofore made on counts one, nine, ten, eleven and twelve, we affirm the convictions on counts two to eight and thirteen to forty eight.

These affirmances are subject to consideration of the further alleged errors of law concerning the admission of testimony and the instructions of the court to the jury.

 It is claimed, on behalf of the appellant, that the trial court erred in allowing the prosecution to cross examine certain defense witnesses concerning their knowledge of pending professional disciplinary proceedings against the appellant. The defense called four doctors who testified as to the good character of the appellant. On cross examination they were asked if they knew that the Jefferson County Medical Society had instituted disciplinary proceedings against the appellant. There is no merit to this alleged ground of error. The Supreme Court said, in *Michelson v. United States*, 335 U.S. 469, 479, 69 S.Ct. 213, 220, 93 L.Ed. 168 (1948),

"The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him. The prosecution may pursue the inquiry with contradictory witnesses to show that damaging rumors, whether or not well-grounded, were afloat—for it is not the man that he is, but the name that he has which is put in issue. Another hazard is that his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose rumors and

reports that are current even if they do not affect his own conclusions. It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate. Thus, while the law gives defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans.

The trial judge properly instructed the jury on the application of this testimony.

In a further claim of alleged error in the admission of evidence, the appellant challenges what he terms the "effusion of unrelated and prejudicial evidence (dealing) with 'the drug scene' and 'drug use and sales.'" Specifically, appellant challenges the relevancy of testimony to the effect that his patients sold drugs which they had obtained pursuant to prescriptions issued them by appellant. In addition, appellant argues that the witness Whalen should not have been allowed to testify about the manner in which preludin could be crushed in a spoon, heated, drained into a syringe and injected into his arm in order to obtain a euphoric high. Thirdly, appellant argues that the witness Clark should not been allowed to testify about the intense sensation of euphoria and false sense of energy obtained from the drugs, as a result of which he testified " * * * you could work yourself into a heart attack. * * * I've known several people that have died." Finally, appellant challenges the relevancy of testimony of Doctor Green that physicians' prescriptions are a large source of drugs used in the drug community, and that the drugs can have severe toxic aspects.

Considering all of the issues in this case, including the charge of conspiracy in which it was charged that the object of the conspiracy was for the appellant to supply written orders purporting to be prescriptions to others to enable them to obtain controlled substances for personal use and further distribution, this evidence was relevant.

It is claimed on behalf of the appellant that the trial court erred in allowing the prosecution to call a handwriting expert as a witness after the close of the defense's evidence. The defense argues that it had no prior notice that the prosecution would submit such testimony and that it was in conflict with the pre-trial discovery order. The appellant had testified that certain prescriptions were forgeries written from a prescription pad stolen from his office.

A further claim in this connection is that the court denied appellant's motion for permission to call a handwriting expert on surrebuttal.

We find no abuse of discretion on the part of the trial court and agree with its ruling,

" * * * in the first place, in the court's opinion, that wouldn't be surrebuttal because you've already proved by Doctor Kirk that they're forgeries. They have merely come in here and contradicted your testimony * * * on rebuttal. So now you can't come back again and buttress your case with additional proof that was available to you at the start.

\* \* \* \* \* \*

"Well, you knew * * * that your doctor was going to testify they were forgeries.

\* \* \* \* \* \*

"You could have brought an expert to cooperate with and be consistent with him to show that in an expert opinion he agreed with him that they were forgeries so I'm going to overrule your motion."

We find no error to the claim that the court committed prejudicial error in admitting into evidence certain individual prescriptions. At the time of the trial the court limited the prosecution to admitting only the prescriptions which could be identified by a witness. Before cross examination by the defense, the court allowed defense counsel to inspect the prescriptions which were admitted and to discuss them with his client.

Finally, the appellant objects to the court's instructions to the jury. His first

challenge is to the following instruction relative to fabrication or suppression of evidence.

"When a defendant voluntarily and intentionally offers an explanation or makes such statement tending to show his innocence and this explanation or statement is later shown to be false, you may consider whether this circumstance, the circumstantial evidence, points to a consciousness of guilt. Ordinarily, it is reasonable to infer that an innocent person does not usually find it necessary to invent or fabricate an explanation or statement tending to establish his innocence.

"Whether or not evidence as to the defendant's voluntary explanation or statement points to a consciousness of guilt and the significance to be attached to any such evidence are, again, matters which are exclusively within your province.

\*　\*　\*　\*　\*　\*

"Now, an attempt to suppress or fabricate evidence by a defendant after a crime has been committed is not, of course, sufficient in and of itself to establish his guilt. However, you may consider evidence of such an attempt, along with other evidence in the case, in determining guilt or innocence. Whether or not an attempt at fabrication or suppression of evidence shows consciousness of guilt and the significance to be attached to any such attempt are matters for you to determine."

In the second paragraph of these instructions, the trial judge left it entirely with the jury to determine what weight should be attached to the appellant's testimony.

The appellant concedes that these instructions " \* \* \* are almost verbatim to model instructions in Devitt and Blackmar's *Federal Jury Practice and Instructions* (Third Edition), at Section 15.12 and Section 15.09, respectively." While appellant admits that such instructions may be

appropriate in a proper case there is no evidentiary basis for them in this case. Considering all of the evidence in the voluminous record in this case, we conclude that there is an evidentiary basis for the instruction and that there is no prejudice to the appellant because of it. Further the trial judge left it up to the jury to determine guilt or innocence as a question of fact.

The appellant's second challenge to the court's instructions to the jury relates to the instruction on intent and specifically to the use of the sentence, "It is ordinarily reasonable to infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted."

In *United States v. Denton*, 336 F.2d 785, 788 (6th Cir. 1964), this Court said,

"This instruction has been recently and vigorously criticized by the Fifth Circuit, *Mann v. United States*, 319 F.2d 404 (C.A.5, 1963), cert. denied 375 U.S. 986 [84 S.Ct. 520, 11 L.Ed.2d 474] \* \* \*[3] It has also more recently been held by the Ninth Circuit not to constitute prejudicial error under the whole instruction on intent therein given. *Sherwin v. United States*, 320 F.2d 137 (C.A.9, 1963), cert. denied 375 U.S. 964 [84 S.Ct. 481, 11 L.Ed.2d 420] \* \* \*, rehearing denied 376 U.S. 946 [84 S.Ct. 796, 11 L.Ed.2d 771] \* \* \*. We feel that the second sentence[4] of the instruction quoted above is at best clumsy and, if taken alone, confusing. On this record, however, and under a total instruction on intent very similar to that in the *Sherwin* case, we do not think the error affected any 'substantial right' of defendant."

This Court reaffirmed its holding in *Denton* in *United States v. Releford*, 352 F.2d 36, at 40 (6th Cir. 1966), *cert. den.* 382 U.S. 984, 86 S.Ct. 562, 15 L.Ed.2d 473 (1966).

Although courts other than the Fifth Circuit have been critical of the instruction, most courts have held that reversal is not required when the instructions on intent,

---

**3.** *See also United States v. Chiantese*, 560 F.2d 1244 (5th Cir. 1977).

**4.** "So unless the contrary appears to you from the evidence, you may draw the inference that Mr. Denton intended all the consequences

which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any act knowingly done or knowingly omitted by him."

taken as a whole, were adequate and sufficiently insured against the jury's being misled. In other words, giving the instruction has been held not to be plain error or reversible error, without more. See *United States v. Haldeman*, 181 U.S.App.D.C. 254, 559 F.2d 31, at 116 (1976), *cert. den.*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Cohen v. United States*, 378 F.2d 751, at 755 (9th Cir. 1967), *cert. den.* 389 U.S. 897, 88 S.Ct. 217, 19 L.Ed.2d 215 (1967); *McCarty v. United States*, 409 F.2d 793, at 799–801 (10th Cir. 1969); *U. S. v. Wilkins*, 385 F.2d 465, at 473 (4th Cir. 1967); *Moore v. United States*, 375 F.2d 877, at 880–882 (8th Cir. 1967).

We hold that the instructions of the trial court on the subject of intent, taken as a whole, were clear and fair, not calculated to mislead the jury, and did not affect any substantial right of the appellant.

Further, considering the record as a whole, the evidence of the appellant's guilt is overwhelming.

The judgment of conviction in the District Court is affirmed in all respects.