UNITED STATES of America, Plaintiff,

v.

Keith HALL, Kenneth Chamberlain, Daniel F. Heberling, Donald L. Pelfrey, and Gregory Arnold, Defendants.

No. CR 3–82–44.

United States District Court, S.D. Ohio, W.D.

Nov. 15, 1985.

Kathleen Brinkman, Asst. U.S. Atty., Cincinnati, Ohio, James A. Wilson, Sr. Asst. U.S. Atty., Dayton, Ohio, for plaintiff.

James Lagos, Springfield, Ohio, for defendants Keith Hall and Kenneth Chamberlain.

R. Scott Croswell, III, Cincinnati, Ohio, for defendants Daniel Heberling and Donald Pelfrey.

Marcus Carey, Ft. Mitchell, Ky., for defendant Gregory Arnold.

## VERDICTS

RICE, District Judge.

The captioned cause came on to be heard by the Court sitting as the trier of fact, a jury having been waived by the Defendants in open Court, upon the Defendants' pleas of not guilty, their Stipulations of Fact and the memoranda of counsel.

## I. GENERAL GUIDELINES TO BE FOLLOWED BY THIS COURT

On May 13, 1983, this Court issued its Seventh Preliminary Pretrial Conference Order (Doc. #320), in which it stated, in clear and unmistakable terms, that "[t]he Court deems it appropriate to compel the Government to particularize which Act or Acts it intends to rely upon to link ... with the conspiracy. Similarly, ... it is the Order of the Court that the Government must set out which *additional* overt acts, if any, as to *any* moving Defendant it intends to present evidence upon at trial." Counsel for the Government partially complied with this Court's Order, but made no compliance as to any of the five Defendants whose cases are now under submission. Therefore, on June 2, 1983, in its Eleventh Preliminary Pretrial Conference Order (Doc. #336), this Court ruled "[t]hat the Government be and hereby is precluded from introducing any evidence concerning conduct constituting an overt act in furtherance of an alleged conspiracy [as set forth in Count I of the Indictment], against any Defendant which has directly or impliedly sought a Bill of Particulars as to conduct constituting an overt act, which said conduct has not been set forth either in the Indictment or in a Bill of Particulars furnished pursuant to this Court's Seventh Preliminary Pretrial Order." Counsel for the Government, feeling aggrieved by this Order of the Court, perfected a timely appeal to the United States Court of Appeals for the Sixth Circuit. Following the appellate court's affirmance of this Court's Preclusion Order, the Government's attorney informed this Court that she would produce the Bill of Particulars with the overt act evidence. This Court, however, indicated, in the following language, during a telephone conference between Court and counsel, that the Government was now precluded from producing this evidence at trial:

THE COURT: Well, it's my feeling, without qualification, that you had your

opportunity to amend your bill of particulars and, very respectfully, you declined to do it. I gave you a deadline. I told you if you passed the deadline it would be excluded. As far as I'm concerned, that stands. And you can file anything you want, but it's not going to have any impact on your ability to introduce evidence unless the Sixth Circuit tells me that I'm wrong.

Once again, Government's counsel appealed, this time asking the appellate court to order the district court to permit the Government to file a Bill of Particulars setting forth any additional overt acts upon which the Government intended to present evidence at trial. The appellate court declined to do so, concluding that "[i]f, in a criminal case, the Government refuses to comply with a pretrial order which requires the production of evidence, or a summary thereof, and the district court responds to this refusal by suppressing or excluding the evidence, the Government risks the permanent exclusion of this evidence if its subsequent appeal of the underlying legal issue is unsuccessful." In short, the appellate court concluded that the Government chose not to follow this Court's Order of May 13, 1983, to summarize its overt act evidence, gambling that the appellate court would reverse the district court's ruling and that, as a result, the Government could avoid having to disclose its overt act evidence prior to trial. "Having gambled and lost," the appellate court stated, the Government will not be able to "eliminate the risk which [it] ... incurred when it chose to appeal."

Thus, this Court's Preclusion Order filed June 2, 1983, stands affirmed in all respects.

Nothing in the stipulated facts which form the basis of the submission of this case to this Court will in any way avoid, mitigate or vitiate this Court's Preclusion Order. Indeed, even assuming arguendo (which this Court, pointedly, does not), that the stipulation entered into by and between the parties is ambiguous as to whether any conduct constituting overt acts in further of the conspiracy set forth in Count I, not revealed in either the Indictment or a Bill of Particulars, can be so used against any Defendant, this Court states that no stipulation of counsel can ever constitute an "end run" around any Court Order, particularly when that Order has been affirmed by the Court of Appeals.

Therefore, in considering the stipulations and the evidence with respect to these five Defendants, this Court will *not* consider any evidence concerning conduct constituting an overt act in furtherance of an alleged conspiracy not set forth in the Indictment, since all of said Defendants, directly or impliedly, sought a Bill of Particulars as to conduct constituting these overt acts.[1]

The essential elements of the conspiracy charge set forth in Count I of the Indictment, pursuant to the law of the Sixth Circuit at the time of the filing of the Indictment herein, was set forth in *United States of America v. Thompson*, 533 F.2d 1006, 1009 (6th Cir.1976), *cert. denied*, 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976) as follows:

1. The conspiracy described in the indictment was willfully formed, and was existing at or about the time alleged;

2. The accused willfully became a member of the conspiracy;

3. One of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment, at or about the time and place alleged; and

4. Such overt act was knowingly done in furtherance of some object or purpose of the conspiracy, as charged.

1. As the Court stated in its Ninth Preliminary Pretrial Order, "[i]t must be emphasized that this Bill of Particulars should not reveal the evidence by which the Government intends to prove the allegedly conspiratorial conduct, but need only set forth that allegedly conspiratorial conduct, in the nature of an overt act, which it claims links the Defendant to the conspiracy." This Court sought only to have the Government set forth the Defendant's conduct constituting an overt act, not the evidence by which the Government would prove this conspiratorial conduct.

■ Pursuant to this Court's Preclusion Order, and consistent therewith, this Court will not consider any evidence concerning conduct constituting an overt act in furtherance of the conspiracy, where such conduct has not been set forth either in the Indictment or in a Bill of Particulars.

Following both the filing of the Indictment in the captioned cause and the stipulations of counsel which form the basis of the submission of this matter to the Court, the United States Court of Appeals for the Sixth Circuit held, in *United States of America v. Dempsey*, 733 F.2d 392 (6th Cir.1984), that a conviction of conspiracy set forth under 21 U.S.C. 846 (the statutory section under which the Indictment for conspiracy was brought in the case herein) is valid, without allegation or proof of an overt act. Since this case is, without question, applicable to the instant litigation,[2] the Court concludes that the Government need only prove, beyond a reasonable doubt, the first two of the above-mentioned *Thompson* criteria, in order to sustain a conviction of conspiracy as alleged under Count I of the Indictment, to wit:

1. the conspiracy described in the Indictment was willfully formed, and was in existence at or about the time alleged; and

2. the accused willfully became a member of the conspiracy.

It is important to note that this Court's Preclusion Order did not apply to the first two (the only two which still have legal significance pursuant to *United States v. Dempsey, supra*) of the then four essential elements of conspiracy as set forth in the *Thompson* case, to wit: the conspiracy described in the Indictment must be shown to have been willfully formed and in existence at or about the time alleged and that the accused willfully became a member of the conspiracy.

■ During a conference call, upon the record, between Court and counsel on March 28, 1984,[3] the results of which were journalized in this Court's Seventeenth Preliminary Pretrial Conference Order, filed on April 5, 1984, the Court made it clear that the involvement of a given defendant in the conspiracy as charged can be proven in a manner other than through the use of evidence of overt acts. For example, involvement in a conspiracy can be shown through direct and circumstantial evidence, standing alone, or through direct and circumstantial evidence of conduct, which, while not admissible on the no longer necessary overt acts aspects of the conspiracy count, is admissible to show both the existence of the conspiracy and a given defendant's involvement in it.[4] In short, this

---

2. Not every judicial expansion [or constriction] of statutory construction creates an *ex post facto* law; rather statutory construction which is unexpected and indefensible by reference to law which has been expressed prior to conduct in issue creates *ex post facto* law. *United States of America v. Martino*, 648 F.2d 367, 381 (5th Cir. 1981), citing *Bouie v. City of Columbia*, 378 U.S. 347, 354, 84 S.Ct. 1697, 1703, 12 L.Ed.2d 894 (1964). It cannot be said that the interpretation of § 846 in *Dempsey* was "unexpected and indefensible" since it was the law of other circuits prior to 1978 (the beginning of the conspiracy herein) that proof of overt acts was not required to convict under § 846. *See e.g. U.S. v. Beasley*, 519 F.2d 233, 247 (5th Cir.1975); *U.S. v. DeJesus*, 520·F.2d 298, 301 (1st Cir.1975); *U.S. v. Bermudey*, 526 F.2d 89, 94 (2d Cir.1975). *Cf. U.S. v. Dreyer*, 533 F.2d 112, 117 n. 6 (3d Cir.1976) (interpreting 21 U.S.C. § 963 which the court said was identical to § 846).

This discussion is somewhat academic, however, in view of the fact that all but two of the

overt acts set forth in the Indictment have been stipulated as being proven beyond a reasonable doubt by evidence adduced at trial.

3. A copy of the partial transcript of that conference is appended to this opinion.

4. The Court also concluded, upon the record, during its conference call with counsel on March 28, 1984, the results of which were journalized in the Court's Seventeenth Preliminary Pretrial Conference Order on April 5, 1984, that the Preclusion Order would be modified to the extent of allowing the prosecutor to use any evidence of any substantive count in the Indictment against a specific Defendant, to be used as conduct constituting an overt act knowingly done in furtherance of some object or purpose of the conspiracy, by that given Defendant, regardless of whether the conduct constituting the substantive act in the Indictment had been set forth on an overt act in the conspiracy count or revealed in a Bill of Particulars. The reasoning

Court never indicated, expressly or impliedly, that the precluded evidence—the evidence concerning conduct constituting an overt act—was inadmissible for *all* purposes.[5] For example, the same evidence of conduct might be probative of overt acts taken in furtherance of the conspiracy, on the one hand, and of the formation and existence of the conspiracy and a given defendant's joining of same on the other. Under the narrowly drawn Preclusion Order, the evidence would be inadmissible for the former purpose, but admissible for the latter. It is too elementary a proposition of law to require citation of authority that the same evidence may be inadmissible for one purpose and admissible for another.

Therefore, while this Court will not consider any of the precluded evidence in its determination of whether the Defendants, or others with whom they were jointly indicted in the conspiracy count, knowingly committed at least one of the overt acts charged in the Indictment, which overt act was knowingly done in furtherance of some object or purpose of the conspiracy, as charged, this Court will consider *all* stipulated facts and evidence [6] in its determination of whether:

1. the conspiracy described in the Indictment was willfully formed, and was in existence at or about the time alleged; and

2. the accused willfully became a member of the conspiracy.

## II. DANIEL F. HEBERLING

The evidence stipulated against the Defendant, Daniel F. Heberling, on Count 1 of the Indictment consists of the Stipulations of Fact, the Overt Acts set forth in Count 1 of the Indictment, particularly Overt Acts 1, 2 and 3, save and excepting Overt Acts 11 and 40, which must be resolved by this Court. The evidence against the Defendant includes the evidence set forth in the Bill of Particulars and the Partial Bill of Particulars. There is also considerable physical evidence, stipulated as admissible, consisting largely of records seized from other individuals named in the Indictment. The evidence also includes the Evidence Interpretation of Special Agent Richard Stuart and the General Information Regarding Marijuana and Cocaine Distribution Organizations. Both the Evidence Interpretation and the General Information have been stipulated as admissible in the stipulations between counsel. There are also numerous tapes and transcripts of phone conversations involving Defendant Heberling, which the Court will discuss individually. Defendant Heberling has stipulated that he was also known as "Go", "Gome" and "Gomez" to persons named in the Indictment.

behind this modification of the Preclusion Order was that, unlike other overt acts not set forth in the Indictment or in the Bill of Particulars, the Defendants who had been charged, both with conspiracy and with a substantive count in the Indictment, would certainly have had notice of not only the substantive count in the Indictment set forth against him but also the fact that this substantive count allegedly occurred during the pendency of the conspiracy charged in Count I.

**5.** That this issue was never finally resolved between Court and counsel can be seen in the partial transcript of the telephone conference of April 5, 1984 (attached), during which the Court indicated that before it would decide the question of whether evidence of conduct of overt acts was inadmissible for all purposes or admissible solely on the issues of formation of the conspiracy and the Defendants' joining of it,

counsel would have to brief the issue. Briefing never took place, since almost immediately after the telephone conference, the parties began to discuss the possibilities and the mechanics of the stipulation that forms the basis of the presentation of this case to the Court. While the transcript reveals that the Court, then, had doubts as to the wisdom of the course it is following now, it is equally clear that the Court was looking to counsel to brief the issue before deciding the question with finality. That briefing has now been accomplished in briefs submitted upon the merits of this case. The Court, having reviewed the briefs and having conducted its own research, has resolved the issue as stated herein.

**6.** Which will include, in addition to stipulated facts and evidence, those of the overt acts and substantive counts stipulated to being proved beyond a reasonable doubt at trial.

## A. EXISTENCE OF THE CONSPIRACY

The United States contends that it has proven beyond a reasonable doubt that the conspiracy described in the Indictment, involving roughly 40 people, was willfully formed, and was in existence at or about the time alleged, that is from 1978 through 1982. Defendant Heberling's position is that,. while the Government can prove one or more smaller and more limited conspiracies, there is a fatal variance between the Government's proof and the wide-ranging single conspiracy described in the Indictment.

The Court notes that, in this Circuit, a single conspiracy is proven by the Government when it is shown that each alleged member of the conspiracy agreed to participate in what he or she knew to be a collective venture directed towards a common goal. *United States v. Warner*, 690 F.2d 545, 549 (6th Cir.1982). In explaining the Government's burden of proof in establishing such a conspiracy, the case law takes into account the type of criminal activity set into motion in a narcotics conspiracy. The sale and re-sale of drugs, enroute to the ultimate consumer, is dependent upon the existence of several levels of narcotics distribution. Thus, each member of the conspiracy must realize that he or she is participating in a joint enterprise, even if he or she does not know the identity of many of the other participants. As a result of this method of operation, the courts have held that the agreement central to an alleged conspiracy can be inferred from the interdependent nature of the criminal activities shown. *Id.* It also follows, then, that a single conspiracy does not become a multiple conspiracy simply because each member of the conspiracy did not know of or become involved in all of the activities in furtherance of the conspiracy, or know every other member. *United States v. McLernon*, 746 F.2d 1098, 1108 (6th Cir.1984).

Based on the evidence stipulated as admissible, outlined *supra*, it appears that the Government does not merely rely upon separate acts of a similar nature which were unconnected to an overall plan or scheme. Rather, the United States has established beyond a reasonable doubt the existence of the conspiracy alleged in Count I of the Indictment, based on the following:

1. Overt acts, stipulated by Defendants as admissible (OA 1, 2, 3) and physical evidence also stipulated as admissible, having been seized from Dennis P. Recore, Charles A. Pompos and Gale L. Callaway (DPR–54A, 54B, 55A; CAP–9F, 9G; GLC–9C, 9D) and the Bill of Particulars (BP) indicate that Defendant Heberling was involved in drug distribution transactions, from August, 1978 through the end of 1981.

2. A host of substantive counts in the Indictment (C2, 3, 4, 5, 6, 7, 8, 10, 13, 17, 19, 20, 21, 22, 24, 26, 28, 29, 30, 32, 36, 37) indicate that Dennis P. Recore and Donald Chamberlain, acknowledged by Defendant Heberling to have at least been "key figures" in several small conspiracies, (Doc. #452 at 9), engaged in drug transactions throughout the period alleged in the Indictment.

3. The Bill of Particulars, which is stipulated as admissible in this case, establishes that Charles A. Pompos worked for Daniel Heberling and Dennis P. Recore in 1978 and 1979, engaging in drug distribution transactions on their behalf. (BP ¶ 10). Charles A. Pompos engaged in drug transactions for both Daniel Heberling and Dennis P. Recore in the summer of 1981 (BP ¶ 6). During that same summer, the summer of 1981, Charles A. Pompos also worked for Donald Chamberlain, obtaining a bale of marijuana from Donald Chamberlain while allowing Donald Chamberlain to use his (Pompos's) residence as a "stash" for Donald Chamberlain's marijuana (BP ¶¶ 7, 8). Charles A. Pompos, during this summer of 1981, prepared for distribution 500 pounds of marijuana belonging to Donald Chamberlain (BP ¶ 17).

4. As established in OA 9, which is stipulated as admissible, in February or March

of 1979, Dennis P. Recore and Robert D. Terry delivered 200 pounds, approximately, of marijuana to Donald Chamberlain. A number of substantive counts and overt acts, stipulated as admissible, indicate that Robert D. Terry worked for Dennis P. Recore and Donald Chamberlain in drug distribution transactions, as well as for Daniel Heberling. (OA 1, 2, 3, 5, 6, 7, 8, 14, 16, 17, 18, 19, 20, 21, 23, 26, 27, 28, 52, 67, C5, DPRR–28B, RDT–10B).

5. Certain overt acts and substantive counts, stipulated as admissible, indicate that Charles A. Whittenburg was involved in drug transactions with both Dennis P. Recore and Donald Chamberlain. (OA 6, 7, 8, 53, C77, C85, C118, C121, C127, C152).

6. Physical evidence seized from Dennis P. Recore and the testimony of Special Agent Stuart about this evidence have both been stipulated as admissible. Dennis P. Recore's records indicate that Daniel Heberling and Dennis P. Recore, together with others, were part of an acquisition and distribution system of quantities of marijuana in excess of 1,000 pounds and the transfer of payments for marijuana (DPR–27B, 29A, 48A, 48B, 54A, 54B). At some juncture, Dennis P. Recore and Daniel Heberling were involved in transfers of bales of marijuana, identified by a recordkeeping system devised by Dennis P. Recore (DPR–43A, 51A).

7. Physical evidence seized from Donald Chamberlain and stipulated as admissible indicates that Donald Chamberlain used a credit card in the name of Daniel Heberling to rent a car in California for the period from February 24, 1981 through March 13, 1981 (DMC–3).

8. Daniel Heberling and Dennis P. Recore were still involved in drug distribution transactions together at the time of an aborted transaction in North Carolina involving a 4,000 pound load of marijuana in July, 1981. Dennis P. Recore, Jeffrey Morford and Paul Heberling were among those arrested in North Carolina (DPR–63). The equipment which Dennis P. Recore and the others had with them when they were arrested, according to Special Agent Stuart, included flares, scanners and a citizen band radio. Physical evidence seized from Dennis P. Recore (DPR–5A), stipulated as admissible, included a piece of paper with the notation "Go house-CB-scanner." In two letters to his wife, written from his jail cell in North Carolina, Dennis P. Recore advised his wife that Defendant Heberling could answer any questions about his arrest (DPR–72) and that Daniel Heberling should be asked for funds to meet Dennis P. Recore's bond in North Carolina (DPR–67).

9. Defendant Heberling bought drugs from Donald Chamberlain through Charles A. Pompos. Physical evidence seized from Charles A. Pompos, stipulated as admissible, reflects several payments by Daniel Heberling to Charles A. Pompos and payments of those sums by Charles A. Pompos to Donald Chamberlain in November and December, 1981. Daniel Heberling also received payments for marijuana and cocaine ("Joe") through Charles A. Pompos (CAP–9E, 9F, 9G). Special Agent Stuart testified that "Joe" was slang for cocaine among Defendant Heberling and his associates.

10. Gale L. Callaway's records, stipulated as admissible, reveal that certain bales of marijuana were designated by Gale L. Callaway for transfer to or distribution by Defendant Daniel Heberling (GLC–9C, 9D). As testified to by Special Agent Stuart, Gale L. Callaway worked closely with Donald Chamberlain in drug transactions.

11. Donald Chamberlain received approximately 200 pounds of marijuana from Dennis Recore and Robert D. Terry in February or March, 1979. (OA 9). Dennis Recore gave Donald Chamberlain a quantity of cocaine in November, 1981 (OA 42).

12. In the transcript of a phone call on November 30, 1981, from Howard Taylor to his wife (T–22–C–50), which Taylor made from the home of Donald Chamberlain, Taylor indicated that he had just left the home of Daniel Heberling and that Heberling had failed to pay him (Taylor) a debt which Heberling owed to him. Taylor indicated that he had been unable to argue

with Heberling about the debt due to the presence during the conversation of Donald Chamberlain. Other evidence stipulated as admissible indicates that, earlier in the alleged conspiracy, Howard Taylor worked for and/or was involved in drug transactions with Dennis P. Recore and Donald Chamberlain. (C26, C93, HPT–1, 2A, DPR–67, T–20–B–36, T–28–C–55).

13. The fact that a conspiracy can be divided into distinct sub-groups does not mean that there is more than one conspiracy. As long as the different sub-groups are committing acts in furtherance of one overall plan, which in this case was the chain of distribution of unlawful substances, a single, continuing conspiracy can still be found. *United States v. Warner*, 690 F.2d at 550. The United States has established beyond a reasonable doubt the existence of the conspiracy alleged in Count I.

### B. DANIEL HEBERLING'S MEMBERSHIP IN THE CONSPIRACY

Subparagraphs 1 through 13 set forth with respect to the first part of the *Dempsey* test, that being the existence of a conspiracy alleged, also amply attest to Defendant Heberling's membership in said conspiracy, the second and final portion of proof of conspiracy under *Dempsey*. It also appears, beyond a reasonable doubt, with respect to Defendant Heberling:

1. Defendant Heberling received substantial sums as payments for drug transactions, as reflected by records seized from Dennis P. Recore and Charles A. Pompos and stipulated as admissible. (DPR–56C, CAP–6D, CAP–10A). Special Agent Stuart testified that payments made to Defendant Heberling were from the sale of both marijuana and cocaine (CAP–10A).

2. Defendant Heberling's whereabouts and involvement with drug distribution and supply remained of considerable concern to other individuals named in the Indictment as late as November 21, 1981. As revealed in a transcript of a phone conversation on that date (T–13–C–53), Charles A. Pompos discussed Defendant Heberling's return to Southern Ohio from Florida, and his hope that Defendant Heberling "was going to do good tomorrow." Just prior to their discussion of Defendant Heberling, Charles A. Pompos and Donald Chamberlain had discussed another individual whom Pompos had indicated "couldn't do me good today." For another discussion between Charles A. Pompos and Donald Chamberlain about "doing good" in connection with "Jamie Sence," that is, Jamaican Sensimilla marijuana, see T–36–BB–71.

3. In August, 1978, Defendant Heberling and Dennis P. Recore paid Robert D. Terry and Charles A. Pompos to drive marijuana from Florida to Ohio (OA 1). In October or November, 1978, Defendant Heberling and Dennis P. Recore caused Jeffrey D. Morford and Robert D. Terry to transport approximately $120,000 in payment for drugs from Ohio to Florida (OA 2). During this same October/November period in 1978, Defendant Heberling also caused Robert D. Terry and Frederick Heberling to transport marijuana from Florida to Ohio. (OA 3).

4. In February or March, 1979, Dennis P. Recore, Charles A. Pompos, Donald Chamberlain and others were involved in the transportation of 4,000 pounds of marijuana from Florida to Ohio. (OA 5–10).

5. The parties have stipulated, with respect to OA 11, that Defendant Heberling caused Jeffrey J. Morford and Gregory Arnold to transport $119,000 in the Ft. Lauderdale, Florida, area on February 23, 1979. While the Government's evidence as to this overt act is not overpowering, the evidence is sufficient to constitute proof beyond a reasonable doubt that this $119,000 was transported in relation to a drug distribution transaction, particularly in view of the fact that, as long as the circumstantial evidence and the direct evidence constitute proof beyond a reasonable doubt, it is not necessary that the circumstantial evidence remove every reasonable hypothesis except that of guilt. *United States v. Conti*, 339 F.2d 10, 13 (6th Cir.1964).

One of the couriers of the $119,000 at issue in OA 11, Jeffrey J. Morford, had transported on Defendant Heberling's behalf nearly an identical sum for drugs several months prior to the February 23, 1979, event at issue in OA 11. Defendant Heberling had been involved in a series of drug-related transactions between Florida and Ohio in the months prior to February 23, 1979. Scrutiny of the tax returns of Daniel F. Heberling, Gregory Arnold and Jeffrey J. Morford indicate no legitimate source whatsoever for that sum of cash.[7] Jeffrey J. Morford and Gregory Arnold petitioned the Government for the return of that money, but were willing to settle for one-half the sum in return. Again, no legitimate source was shown for this money. The Government, accordingly, has proven beyond a reasonable doubt that the $119,000 discussed in Overt Act 11 was related to controlled substances. The Government has also proven beyond a reasonable doubt that Defendant Heberling willfully became a member of the conspiracy alleged in Count I.

The Defendant Heberling is thus Guilty as charged of Conspiracy as set forth in Count 1 of the Indictment.

## III. DONALD L. PELFREY

The evidence stipulated against the Defendant, Donald L. Pelfrey, in Count 1 of the Indictment, consists of the Stipulations of Fact, the Overt Acts set forth in Count 1, excepting Overt Act 40 (OA 11 having been resolved in the discussion of the Defendant Heberling, *supra*), the evidence set forth in the Bill of Particulars and Partial Bill of Particulars, and the tape and transcripts of phone conversations T–20–A–2 (between Donald Chamberlain and Greyland Pelfrey on November 28, 1981) and T–52–C–58 (between Tammy Terry and Donald Chamberlain). The evidence also includes physical evidence stipulated as admissible (DPR–31A, DPR–47, DPR–54A, DPR–67, DPR–72, and HPT–1), and the

evidence interpretation and general information of Special Agent Stuart.

### A. EXISTENCE OF THE CONSPIRACY

1. Donald Pelfrey's argument as to the variance between the Indictment and the conspiracy proven by the United States is identical to that raised by Defendant Heberling, and is found unpersuasive for the same reasons outlined by the Court, *supra*. The Court finds, for the reasons outlined in Part IIA, that the United States has proven the existence of the conspiracy beyond a reasonable doubt.

### B. MEMBERSHIP IN THE CONSPIRACY

Based on the aforesaid evidence, it appears, beyond a reasonable doubt, that:

1. As established in the Partial Bill of Particulars, Defendant Pelfrey bought drugs from Michael Kukoleck, Donald Chamberlain and Dennis P. Recore. Defendant Pelfrey was one of the people who introduced Michael Kukoleck to Donald Chamberlain. Defendant also procured marijuana and cocaine from other persons, including, during the period of 1978 through 1982, his brother, Greyland Pelfrey, who committed certain overt acts set forth in the amended Partial Bill of Particulars which have been stipulated as proven beyond a reasonable doubt.

2. Physical evidence stipulated as admissible, and the testimony of Special Agent Stuart, show that Dennis P. Recore sold quantities of cocaine to Defendant Pelfrey at some point in mid-1980 (DPR–31A). This physical evidence reflects sales by Dennis P. Recore for marijuana and cocaine to "Don" and "Grey", that is, Greyland Pelfrey, the brother of Defendant Donald Pelfrey. Indeed, one sale of cocaine, in particular, was made to Defendant Donald Pelfrey instead of to his brother Greyland Pelfrey. Although Defendant Donald Pelfrey contends that this physical

---

7. The Court has no evidence before it to support Defendant Arnold's assertion that the tax returns proffered by the Government and stipulated as admissible are in fact the tax returns of another individual residing in Ohio whose name is also "Gregory Arnold."

evidence could refer to any individual named "Don", and not necessarily to Defendant Donald Pelfrey, it is reasonable to infer that this evidence refers to Defendant Donald Pelfrey.

3. Physical evidence stipulated as admissible, and the testimony of Special Agent Stuart, reveal that on August 21, 1981, at least four bales of marijuana were sold to Donald Pelfrey by Dennis P. Recore (DPR–54A). Dennis Recore's records indicate a sale to an individual with the initials "D.P." Donald Pelfrey has stipulated that he bought marijuana and cocaine from Dennis P. Recore. Defendant Pelfrey is the only individual, among those individuals who have been shown to have dealt in drugs with Dennis P. Recore, with the initials "D.P.".

4. Overt Act 17 and Count 4 of the Indictment, which would (pursuant to stipulation) be proven beyond reasonable doubt at trial, and other physical evidence (HPT–1), reveal that David Dennison and Howard P. Taylor worked for Dennis P. Recore in his drug business. In a letter to his brother Dennis P. Recore, Patrick A. Recore refers to "Don", along with David (Dennison) and Howard (Taylor), in asking for all of these individuals to contact him while he served his jail term. Patrick A. Recore also referred to "Donnie C." that is, Donald Chamberlain, in the same letter, thus distinguishing Donald Chamberlain and Defendant Pelfrey as two separate individuals with whom he and Dennis P. Recore had had dealings prior to Patrick A. Recore's incarceration. Patrick A. Recore was involved in overt acts set forth in the Indictment which would, pursuant to stipulation, be proven beyond a reasonable doubt at trial. (OA 4, 15).

5. In the transcript of a telephone conversation between Donald Chamberlain and Greyland Pelfrey (T–20–A–2), stipulated as admissible, Donald Chamberlain makes several references to Defendant Pelfrey which indicate Defendant's involvement in the drug distribution scheme of Donald Chamberlain. Donald Chamberlain indicates that he had met Michael Kukoleck at "Don's" house, corroborating Defendant Pelfrey's stipulation that he introduced Kukoleck to Chamberlain. Donald Chamberlain also indicates that he had been introduced to "Willy", another drug source, by Defendant Pelfrey. Donald Chamberlain then refers to Defendant Pelfrey, along with others, as an individual working for him and with him in his drug business.

6. The tape of a telephone conversation (T–52–C–58) between Tammy Terry and Donald Chamberlain, stipulated as admissible, shows that Defendant Pelfrey was at Donald M. Chamberlain's house on December 30, 1981, shortly after Thomas H. Smith delivered a quantity of marijuana to Donald M. Chamberlain's house.

 7. The parties do not dispute the law of the Sixth Circuit that, generally, a buyer-seller relationship is not alone sufficient to tie a buyer to a conspiracy. *United States v. Grunsfeld,* 558 F.2d 1231, 1235 (6th Cir.1977), *cert. denied* 434 U.S. 872, 98 S.Ct. 219, 54 L.Ed.2d 152 (1977), 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978). If there is additional evidence, however, beyond the mere purchase of drugs from which it can be inferred that the purchaser had knowledge of the conspiracy, then a conspiracy conviction is warranted. The volume of narcotics actually purchased by a particular individual is among those factors creating the inference of an ongoing relationship with a conspiracy. *Id.*

There is considerable evidence in this record to indicate that Defendant Pelfrey was more than a casual purchaser of drugs from those other persons named in the Indictment. While Defendant suggests that he might well have purchased an occasional joint of marijuana from the others named in the Indictment, the evidence stipulated as admissible against the Defendant reveals that Defendant received quantities of drugs in bulk from persons named in the Indictment. Defendant Pelfrey arranged for continuing sources of supply for those known as purchasers and distributors of large quantities of drugs, and kept active in maintaining the flow of drug distribution transactions generated by the other individ-

uals named in the Indictment. The United States has, accordingly, established beyond a reasonable doubt their allegation that Defendant Pelfrey willfully became a member of the conspiracy alleged in Count I of the Indictment.

The Defendant Pelfrey is thus Guilty as charged of Conspiracy as set forth in Count 1 of the Indictment.

## IV. GREGORY ARNOLD

### A. EXISTENCE OF A CONSPIRACY

For the reasons outlined in Part IIA, *supra*, the Court finds that, Defendant Arnold's objections notwithstanding, the United States has proved beyond a reasonable doubt the existence of the conspiracy alleged in Count 1 of the Indictment.

### B. MEMBERSHIP IN THE CONSPIRACY

The evidence stipulated as admissible against Defendant Arnold includes the Bill of Particulars and Overt Act 11, which the Court concluded in Part II has been proven by the Government beyond a reasonable doubt. Defendant Arnold has also stipulated that the Government could prove beyond a reasonable doubt the other overt acts put forward in the Indictment. Physical evidence stipulated as admissible has been considered (TX–3A–D), including records seized from Dennis P. Recore, Charles A. Pompos and Gale L. Callaway (DPR–27A, 54B, 56A; CAP–2A, 2B, 2C, 6F, 6H, 6L, 10B, 10E; GLC–9A). The parties have stipulated to the admissibility of transcripts of certain telephone conversations (including, but not limited to, a conversation between Defendant Arnold and Donald M. Chamberlain on New Year's Eve, 1981) (T–53–B–27). The evidence interpretation and general information of Special Agent Stuart have also been considered. For purposes of this decision, Defendant Arnold has stipulated that he was known as "Arn", "Arnie", and "Arnny" to other persons named in the Indictment.

Based on the aforesaid, it appears, beyond a reasonable doubt:

1. Physical evidence seized from Dennis P. Recore indicates that, at some juncture, Defendant Arnold received five pounds of marijuana on one occasion (DPR–27A), and four pounds six ounces of marijuana on another, as well as paying $5,000 to Dennis P. Recore. (DPR–56A). On August 31, 1981, Defendant Arnold received five pounds of marijuana from Dennis P. Recore (DPR–54B).

2. Physical evidence seized from Charles A. Pompos and stipulated as admissible indicates that Defendant Arnold received eight pounds of marijuana from Charles A. Pompos, who had obtained that marijuana from Donald M. Chamberlain (CAP–10E). Other records seized from Charles A. Pompos indicate distributions of approximately four pounds of marijuana to Gregory Arnold on approximately three occasions (CAP–2A, 2B, 6F), seven pounds on another occasion (CAP–2C), and another occasion upon which Charles A. Pompos and Gregory Arnold shared nine pounds of marijuana between them (CAP–6H). Other records of Charles A. Pompos show a distribution of five pounds and a distribution of six pounds of marijuana to Gregory Arnold (CAP–10B).

3. The evidence interpretation of Special Agent Stuart indicates that Gregory Arnold worked on cars utilized by Daniel F. Heberling. Physical evidence seized from Charles A. Pompos indicates that Defendant Arnold received credit for such work for Daniel Heberling against the amounts which he paid to Daniel Heberling for distributions of quantities of marijuana (CAP–6L).

4. Physical evidence seized from Gale L. Callaway and stipulated as admissible indicates that Gregory Arnold received at one juncture five pounds of marijuana from Gale L. Callaway. (GLC–9A). Others listed on this exhibit were persons who committed certain of those overt acts which have been stipulated to be proven beyond a reasonable doubt.

5. On December 31, 1981, Donald Chamberlain asked Gregory Arnold whether Arnold would be interested in staying at

the house of Wayne and Linda Taylor for the evening. (T–53–B–27). The Taylors' home was used as a "stash pad" for the marijuana of Donald Chamberlain. Transcripts of other conversations of Donald Chamberlain on December 31, 1981 (T–53–B–17, T–53–B–44) indicate Donald Chamberlain's interest in having the house, as opposed to any children in it, watched for the evening. Donald Chamberlain offered Defendant Arnold a gram of cocaine, some marijuana, and $100 as compensation if he would "babysit" the Taylors' house for the evening.

6. As discussed *supra*, a simple buyer-seller relationship does not in itself establish membership in a conspiracy. On the other hand, a continuous and ongoing relationship between a buyer and a seller, and the close relationship of a buyer to the selling group, can indicate a buyer's involvement and the success of a conspiracy and membership in it. *United States v. Bascaro*, 742 F.2d 1335, 1359 (11th Cir. 1984). To the extent that conspiracy is proven through circumstantial evidence beyond a reasonable doubt, it is not necessary that such circumstantial evidence remove every reasonable hypothesis except that of guilt. *United States v. Conti*, 339 F.2d 10, 13 (6th Cir.1964).

As shown in Overt Act 11, Gregory Arnold has stipulated that he transported approximately $119,000 for Daniel F. Heberling in the Ft. Lauderdale, Florida, area. The Government has proven beyond a reasonable doubt that this sum was related to drug distributions. On December 31, 1981, Defendant Arnold was called by Donald Chamberlain and asked whether he would assume responsibility for babysitting a stash pad containing Donald Chamberlain's marijuana, obviously not a task which would be offered to a person unfamiliar with an ongoing course of drug distribution operations and unknown to or distrusted by those behind such operations. Using these two events as outposts establishing the relationship between Defendant Arnold and other persons named in the Indictment, the Government has established beyond a reasonable doubt that the references to "Arn" and "Arnnie" in the physical evidence seized from others named in the conspiracy in fact are referring to the instant Defendant's receipt of quantities of drugs and payments for them. Not only did Defendant Arnold perform car maintenance work for Defendant Heberling, but, unlike the typical mechanic, he received at least some of his compensation in the form of credit against amounts which he owed for receipt of drugs. The Government has established beyond a reasonable doubt Defendant Arnold's membership in the conspiracy alleged in Count 1.

The Defendant Arnold is thus Guilty as charged of Conspiracy as set forth in Count 1 of the Indictment.

## V. KEITH HALL AND KENNETH CHAMBERLAIN

In addition to being charged with Conspiracy in Count I of the Indictment, Keith Hall is charged in Count 84 with use of a telephone, on November 25, 1981, to facilitate the knowing, intentional and unlawful possession with intent to distribute Marijuana, and Kenneth Chamberlain is charged with a similar violation of statute, 21 U.S.C. 843(b), on December 17, 1981 (Count 135) and December 23, 1981 (Count 141).

### A. KEITH HALL

The evidence stipulated against the Defendant, Keith Hall, on Count 84 of the Indictment consists of the stipulations of fact, the overt acts set forth in Count I of the Indictment, save and excepting overt act 40 (OA 11 having been resolved in the discussion of the Defendant Heberling, *supra*), the evidence set forth in the Bill of Particulars and the Partial Bill of Particulars, the tape and transcripts of phone conversations T–14–C–68 (between Donald Chamberlain and an unidentified female at the Garage Night Club on November 22, 1981), T–14–C–72 (between Keith Hall and Donald Chamberlain on November 22, 1981), T–14–C–77 (between Keith Hall and an unknown male who answered Keith

Hall's call for Doug Graham, on November 22, 1981), and T-17-C-95 (between Keith Hall and Donald Chamberlain on November 25, 1981), and three other taped conversations which have been reviewed in order to put the term "get" or "getting it together" into proper context (T-5-C-18, between Donald Chamberlain and William Allen on November 13, 1981), T-10-B-22 (between Donald Chamberlain and Chuck Pompos on November 18, 1981) and T-23-B-24 (between Donald Chamberlain and Ron Mossbarger on December 1, 1981), the physical evidence stipulated as admissible (DPR-66A, GLC-9B), and the evidence interpretation of Special Agent Stuart and the general information concerning Marijuana and Cocaine distribution organizations, both of which having been stipulated as admissible in the stipulation between counsel.

Based on the aforesaid, it appears, beyond a reasonable doubt, that:

1. The Defendant was involved, at least, with Dennis P. Recore in a transaction in which he (the Defendant) owed Recore $1720 (DPC-66A) and that the others listed on the exhibit were persons who committed certain of the overt acts which have been stipulated as being proven beyond a reasonable doubt.

2. The Defendant received, at one juncture, five pounds of Marijuana at $275 per pound (GLC-9B), according to records seized from Gale Callaway. Others listed on that exhibit were persons who committed certain of those overt acts stipulated to be proven beyond a reasonable doubt and who were, according to the tapes and transcripts of the wiretap, in evidence, in frequent contact with Donald Chamberlain during the period of the wiretap.

3. The series of phone calls between Donald Chamberlain and Keith Hall reflect the fact that this Defendant was to "get together", i.e. to get a sum of money to Chamberlain to satisfy his (the Defendant's) debt for Marijuana having been issued to him on consignment ("fronted" for him).

That the term "getting it together" refers to a term used among the Defendants in this conspiracy to signify the collection of money owed by persons to whom Marijuana has been fronted or consigned, is made clear, not only in the interpretation of Agent Stuart, but also in the three phone conversations referred to above (T-5-C-18, T-10-B-22 and T-23-B-24 (between Donald Chamberlain and William Allen, Charles A. Pompos and Ron Mossbarger, respectively)), each of which refers to "get" or "getting together" in the context of the collecting of sums of money, said reference being, on several occasions, either immediately before or immediately after a discussion of "needing something", "he's supposed to have a big chunk", "I will try to get some money together for you."

The use of Gale Callaway, aka Coonman, to pick up the money that Keith Hall said he had available for Donald Chamberlain is further indication that the term "getting it together" refers to money paid among these Defendants for Marijuana that had been previously distributed on consignment or fronted for the individual. According to Agent Stuart, whose testimony is stipulated as admissible, Donald Chamberlain often used Gale Callaway to collect sums of money.

4. While the Government's case is not overpowering on this Count, the evidence is sufficient to constitute proof beyond a reasonable doubt that on or about November 25, 1981, this Defendant, along with Donald Chamberlain, knowingly, intentionally and unlawfully used a telephone in facilitating the knowing. intentional and unlawful possession with intent to distribute Marijuana, particularly in view of the fact that, as long as the circumstantial evidence and the direct evidence constitute proof beyond a reasonable doubt, it is not necessary that the circumstantial evidence remove every reasonable hypothesis except that of guilt. *United States v. Conti*, 339 F.2d 10, 13 (6th Cir.1964).

5. Even though the Marijuana had been distributed before the paying of the money from Keith Hall to Donald Chamberlain, the arrangement was such that, without

the promise of payment, the Marijuana could not have been distributed.

■ To prove "facilitation", the Government must show that Defendant's use of a telephone assisted, aided or made less difficult either his own or another person's possession or distribution of marijuana. *United States v. McLernon,* 746 F.2d 1098, 1106 (6th Cir.1984). In *McLernon,* calls made by a defendant to his co-conspirators in order to inform them of the progress of a narcotics deal or to inform them of the next step in a drug transaction were found sufficient to support convictions for unlawful use of a telephone in violation of 21 U.S.C. Section 843(b).

The premise for Keith Hall's receipt of marijuana was that payment would be forthcoming. Defendant Hall's burden in the transaction was reduced considerably by his ability to obtain the marijuana without having to pay for it at the time of receipt. Defendant Hall's telephone call to Donald Chamberlain on November 25, 1981, completed their transaction—the delivery of marijuana with the understanding that payment would follow. The phone call was thus part of a course of conduct which rendered less difficult the Defendant Hall's possession of marijuana with intent to distribute, and completed the transaction which had commenced with Hall's receipt of a quantity of marijuana.

6. Since Count 84 has been proven, beyond a reasonable doubt, Overt Act 40 is, likewise, pursuant to the stipulation, deemed proven beyond a reasonable doubt.

■ 7. So long as a defendant knows the purpose of the conspiracy, he may be guilty of conspiracy even though he has limited knowledge of the scope of the conspiracy and no knowledge of details of the plan or operation in furtherance thereof or of the membership in the conspiracy or of the part played by each member and the division of the spoils. *United States v. Chambers,* 382 F.2d 910, 913 (6th Cir.1967). Evidence stipulated as admissible indicates that Defendant Hall was involved in drug transactions with two of the main players,

Dennis P. Recore and Donald M. Chamberlain, in the conspiracy alleged in Count 1. Defendant Hall both obtained marijuana from at least one of these individuals and paid money to both of these individuals with the knowledge that such payments furthered their distribution and his receipt of drugs. Defendant Hall was clearly aware of the manner in which the conspiracy operated, its accounting system, and the way his distributors did business. Considering all this evidence, it appears beyond a reasonable doubt that Defendant Hall willfully became a member of conspiracy as charged in Count 1 of the Indictment.

## B. KENNETH CHAMBERLAIN

The evidence stipulated against the Defendant, Kenneth Chamberlain, on Counts 135 and 141 of the Indictment consists of the Stipulations of Fact, the Overt Acts set forth in Count 1 of the Indictment, including Overt Acts 11 and 40 which have been concluded as having been proven *infra,* the evidence set forth in the Bill of Particulars and the Partial Bill of Particulars, the tape and the tapes and transcripts of phone conversations (T–49–B–27, T–39–C–62, T–32–B–15, T–34–B–10, T–35–B–18, T–45–C–57). The evidence also included physical evidence stipulated as admissible and the evidence interpretation and general information of Special Agent Richard Stuart, which has been stipulated as admissible. Based on the aforesaid, it appears beyond a reasonable doubt that:

1. Records seized from Howard Taylor, stipulated as admissible, contained several references to "Ken C." One such record indicates that "Ken C." owed $1,500 and $350 respectively to Howard Taylor while "Don C." is listed as owing $6,000. (HPT–2A). Another record indicates that "Ken C." received five pounds of marijuana from Howard Taylor at $300 per pound, that "Ken C." had paid $1,000 and owed $500 (HPT–2B).

Defendant Chamberlain argues that there is no way to determine whether these and other records of drug transactions are referring to Defendant Kenneth Chamber-

lain or to Kenneth Coppess, who was named in the same Indictment as Defendant Chamberlain. With respect to Howard Taylor's records, at least, it is reasonable to infer that "Don C." and "Ken C.", used on the same document, referred to the Defendant and to his brother, Donald Chamberlain, who was also named in the Indictment and who was a key figure in drug distribution transactions.

2. Count 28 of the Indictment, OA 64, and the tape and transcript of phone conversation T–49–B–27 (between Thomas Smith and Gale Callaway), indicate that Thomas Smith delivered a load of marijuana to Donald Chamberlain on December 27, 1981. According to Agent Stuart, David Wayne Taylor stored Donald Chamberlain's marijuana at his (Taylor's) house. Physical evidence seized from Donald Wayne Taylor, stipulated as admissible, indicate that Kenneth Chamberlain received a quantity of marijuana through his daughter Robin on December 30, 1981 (DWT–5B).

3. The series of phone calls between Donald Chamberlain and Kenneth Chamberlain reflect the fact that Donald Chamberlain was providing marijuana to his brother Kenneth Chamberlain to sell. In their phone conversation of December 17, 1981, (T–39–C–62), Donald Chamberlain indicated that he had some "real high dollar stuff", "$7 stuff", "super duper Christmas stuff" which he could provide to his brother. Defendant Kenneth Chamberlain responded that he was having "a hell of a time selling what I'm doing," that is, selling the marijuana which he already had.

That the "stuff" being referred to was high grade marijuana which Donald Chamberlain was willing to consign to Kenneth Chamberlain is made clear not only by Agent Stuart, but in the context of conversations between Donald Chamberlain and other associates during the period of the wiretap where Donald Chamberlain refers to Jamaican marijuana and "Christmas stuff" at prices anywhere from "650" ($650 per pound) to "9" ($900 per pound). (T–32–B–15, T–34–B–10, T–35–B–18).

4. The conversation on December 23, 1981, between Donald Chamberlain and Kenneth Chamberlain (T–45–C–57) reaffirms the consignment relationship between the brothers. In response to Kenneth Chamberlain's indication to Donald Chamberlain that his customers were "hollerin' ", Donald Chamberlain indicated that he might be able to divert a quantity of 30 pounds of marijuana from another customer for his brother's purposes. Kenneth Chamberlain indicated that he would make an attempt to obtain funds to pay for the quantity of marijuana to be provided, while Donald Chamberlain offered to have the marijuana delivered to Kenneth Chamberlain's home. Kenneth Chamberlain indicated that his wife would be there to receive Donald Chamberlain.

Documents seized from Gale Callaway and stipulated as admissible revealed that numerous individuals named in the Indictment received quantities of marijuana from Donald Chamberlain. (GLC–3A, GLC–9A). The Government has shown that Defendant Kenneth Chamberlain's use of a telephone assisted and made less difficult the drug distribution transactions in question. The circumstantial evidence and direct evidence constitute proof beyond a reasonable doubt that on or about December 17, 1981 (Count 135) and December 23, 1981 (Count 141), Defendant Kenneth Chamberlain, along with Donald Chamberlain, knowingly, intentionally and unlawfully used a telephone in facilitating the knowing, intentional and unlawful possession with intent to distribute marijuana.

5. Under the law of conspiracy outlined *supra* in connection with Defendant Hall, it is also established beyond a reasonable doubt that Defendant Chamberlain willfully became a member of the conspiracy alleged in Count 1 of the Indictment. Defendant received drugs for distribution from various other members of the conspiracy. He knew not only how the conspiracy worked, on consignment principles, but was also sensitive to keeping customers who were obtaining their drugs from the conspirators happy with a steady supply. In short, Defendant Chamberlain obviously

knew the purpose of the conspiracy, had considerable knowledge of its scope and method of operation, and thus willfully became a member of the conspiracy alleged in Count 1.

## VI. CONCLUSION

For the reasons set forth in Parts II through V of this opinion, the Government has established beyond a reasonable doubt that Defendants Heberling, Pelfrey, Arnold, Hall and Kenneth Chamberlain are guilty of Conspiracy, as alleged in Count 1 of the Indictment. The Government has established, beyond a reasonable doubt that Defendant Hall violated 21 U.S.C. § 843(b) on November 25, 1981, as alleged in Count 84 of the Indictment. Defendant Kenneth Chamberlain has been proven beyond a reasonable doubt to have violated 21 U.S.C. § 843(b) on December 17, 1981 and December 23, 1981, as alleged in Counts 135 and 141 of the Indictment.

Each Defendant is referred to the United States Probation Department for presentence investigation. Each Defendant must report to the United States Probation Department, 7th Floor, 200 West Second Street, Dayton, Ohio, at 9 a.m., on Monday, December 2, 1985, so that the Probation Department can begin the preparation of the presentence investigation. Final disposition will be scheduled after such time as the probation report has been completed and each Defendant and his attorney have had the opportunity to review same.

## APPENDIX A

### TRANSCRIPT OF PROCEEDINGS

#### MARCH 28, 1984

#### WEDNESDAY MORNING SESSION, MARCH 28, 1984

PROCEEDINGS IN CHAMBERS:

THE COURT: Good morning, all. Let me, if I might, call the role because we are on the record.

This is Case CR–3–82–44, captioned United States versus Donald Chamberlain and countless others.

We have Kathy Brinkman.

MS. BRINKMAN: Present.

THE COURT: We have representing the Defendant Gary Hansen, Michael Carey.

MR. CAREY: Yes, sir.

THE COURT: Representing the Defendant Arnold, we have Marcus Carey.

MR. CAREY: Yes, your Honor.

THE COURT: Scott Croswell represents the Defendants Heberling and Pelfrey.

MR. CROSWELL: Yes, sir.

THE COURT: And James Lagos represents the Defendant Keith Hall and Kenneth Chamberlain.

MR. LAGOS: That's correct.

THE COURT: All right. Now, we are here today simply for a ruling on the motion to sever. And what I would like to do is to chat for a moment on that. And then I think what we are going to need in the fairly immediate future is a meeting together to go over the mechanics. And when I say "together," Michael, Carey, that would exclude you. We will get you by telephone. I don't want you to come in just for a half hour meeting. But I would like everyone else up here on a date that we will set before we break up the conference.

I think we should indicate that Chamberlain, Grout and Morford are going to plead. So the six defendants represented by the four defense counsel on the phone are the only ones going to trial.

Mr. Kahelin starts trial Monday by himself. Ms. Brinkman, is that correct?

MS. BRINKMAN: That's correct, your Honor.

THE COURT: All right. Now, on the motion to sever. I have had quite a few thoughts on this. At one time, as late as yesterday afternoon, I was going to sever the conspiracy count from the substantive counts and simply ask that the case go forward with six defendant, each on one

count of conspiracy, and then later on, if need be, we would pick up the three defendants who had substantive counts charged against them. I have decided against that. And I am going to overrule the motions for severance, simply because I don't feel that there has been a showing that not only the initial joinder but the failure to sever for trial would be prejudicial to the defendants. I think that we can keep everything straight and can do so in fairly easy fashion.

Let me first indicate that I would assume that much of the Government's case, at least in the early part, is going to be taken up by showing this overall conspiracy. And I fully expect the Government to show the formation of the conspiracy and show overt acts committed by defendants who are no longer with us as part of their conspiracy formation.

MS. BRINKMAN: Your Honor, I have a very bad connection. I'm not sure that I heard that last statement that you made. You do expect the Government to prove overt acts by other defendants who have already pled or been disposed of?

THE COURT: That's what I said, Ms. Brinkman.

I expect at the same time the Government is going to show that a particular accused now on trial willfully became a member of the conspiracy. It is necessary then for the Government to show that an overt act was committed by some member of the conspiracy. Whether one of the non-Kahelin six or others is really beside the point.

The one thing that made my—really, two factors that made my decision not to sever are these. Number one, I don't think the Government's proof is going to be any different if we go to trial six different times than if we go to trial one time. And I think that if you buy the defense counsel's theory of prejudice, which I don't, it is going to be just as prejudicial to go to trial individually insofar as what the Government has to show than if we go to trial collectively. That's point one.

Point number two is this. Keeping in mind that the Court of Appeals order makes this case somewhat different, in this sense: In a normal conspiracy case, the prosecutor could use against any defendant on trial charged with conspiracy any overt act which the defendant is alleged to have committed in furtherance of the conspiracy regardless of whether it is listed in the indictment. In other words, if against Defendant A there are five overt acts listed in a normal case, it is my understanding that Ms. Brinkman could produce fifteen other overt acts, even though they are not specified in the indictment, allegedly committed by that defendant.

This case is different in this sense: The Court of Appeals has said, in affirming the order that I came out with last May, that the prosecutor cannot introduce any overt acts against a defendant at trial, allegedly committed by that defendant, not set forth in the indictment.

Now, where does that leave us. My initial feeling, and the reason I was inclined to sever conspiracy counts from substantive counts, was this: That the prosecutor would be unable, because of that Court of Appeals ruling, to use any evidence of the substantive counts as evidence of an overt act alleged to have been committed by that defendant co-conspirator in furtherance of the conspiracy. And the reason I felt that way was because of the Court of Appeals ruling and, further, because in none of the overt acts set forth against the six defendant co-conspirators were the substantive counts set forth as overt acts.

However, upon reflection, I think that basic premise is incorrect, and I think it's incorrect for two reasons. The whole reason behind my ruling on the bill of particulars motion, which took us twice to the Court of Appeals—actually only once for two proceedings—was that it wasn't fair, the way the indictment was worded, to expect the defendants charged with conspiracy to go to trial without more particularity as to the overt acts charged against them. And that's why I told Ms. Brinkman to list the overt acts she intended to use.

The second factor that has taken me away from my earlier position is thoe fact that the Court of Appeals opinion is very clear. It says she can't use any overt acts not set forth in the indictment.

Now, I think it would be a triumph of form over substance and, moreover, wrong, for this Court to conclude that these six defendant co-conspirators, alleged co-conspirators, did not have notice that during the course of the conspiracy it is alleged that they committed an overt act which forms the basis of a substantive count against them. In other words, what I am saying is this, I feel that the Government, for example, can use against Keith Hall—just to bring something out of the woodwork—the fact that he used a telephone to further the drug offense. he is charged with that in Count 84. The time frame for Count 84 is within the broad parameters of the conspiracy. And I think it's a known fact that Keith Hall had to know that during the term of the conspiracy, he is charged with having committed that act. And therefore that act can be used as an overt act in furtherance of the conspiracy count against him.

So it's my conclusion now that with the three defendants charged with substantive crimes in addition to the conspiracy count—that's Keith Hall, that's Gary Hansen and Kenneth Chamberlain—that evidence of the substantive crimes can be used as overt acts in furtherance of the conspiracy which these three defendants are alleged to have joined and engaged in in Count 1.

And having come to this reasoning, I simply feel there is no reason for the severance sought by counsel. Would you all hold for just one moment.

Ms. Brinkman, I am going to start first with you and then I am going to go down the list. And if anybody has anything to say, we are on the record, this is the time to make your record on this point. Ms. Brinkman?

MS. BRINKMAN: Judge, one thing that you raised in the last pretrial order was whether the Government had responded to Mike Carey's Document 364, which was a motion for additional discovery especially relating to the grand jury and whether any additional grand jury work had been done.

I wish to inform the Court and Mike that we did respond on June 5, 1983, in Document 368.

THE COURT: All right. Ms. Brinkman, that's fine. And I am going to come back to that in a moment. But I want you to confine your remarks just to what I said.

MS. BRINKMAN: Fine. I have nothing to add on that point.

THE COURT: Do you have any agreement or disagreement with it?

MS. BRINKMAN: Well, it was my understanding, as you have said, thoat the substantive counts would in fact be admissible as overt acts. And I am glad to have that clarified. I did not know that it was somewhat of an issue. And I do agree that the severance would be improper and that it is manageable the way you have set it up, six defendants and four attorneys, and that there has been no prejudice shown and the original joinder was proper.

THE COURT: All right. Scott Croswell?

MR. CROSWELL: Yes, sir.

THE COURT: Any comment for the record? And I don't expect you to agree with what I have said, but this is the time to put your position on the record.

MR. CROSWELL: Well, your Honor, you know, I still take the position that—that in order to place any of these defendants, and particularly mine, within the conspiracy, to join the conspiracy in itself is an overt act. The conspiracy has to be pled. If it is not pled and each defendant is not on notice, evidence can't come in against that defendant or others and they still have to be severed. But that's my position. I respect your decision and I obviously am prepared to go to trial.

THE COURT: Mr. Croswell, I am not arguing with you at this time but I am trying to make a record, too.

MR. CROSWELL: I'm saying that's just my position. That's what I'm saying.

THE COURT: I respect that. The reason I gave that little preamble is I am going to say something in response, and I don't want you to think I am arguing with you.

Your position is logical, but I am not sure that it comports with the law. It is my understanding that there are four things that have to be shown in order to convict a given defendant of conspiracy. And I am using U.S. v. Thompson, 433 F.2d 1006, from the Sixth Circuit.

Number one, that the conspiracy described in the indictment was willfully formed and it was existing at the time alleged. That's point one. Point two, that the accused willfully became a member of the conspiracy. Point three, that one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment.

Now, that doesn't necessarily, Mr. Croswell, have to be your clients or any one of the people on trial. It can be one of the 34 defendants who have pled guilty.

Four, the overt act by—regardless of by whom committed, was knowingly done in furtherance of some object or purpose of the conspiracy as alleged.

Now, let's talk about your client Pelfrey, for example. There isn't the first word about Pelfrey in the conspiracy count other than he is charged with it. There are no overt acts charged against him, if I'm correct.

MS. BRINKMAN: That's correct, your Honor.

THE COURT: All right. Now, how in God's name are they going to try to convict Pelfrey. Again, going down the four things in the Thompson case—and, Mr. Croswell, I want you to be prepared to argue this at the appropriate time—they have to show that the conspiracy was formed. They have to show by some evidence—and it can be circumstantial—that your client Pelfrey became a member of the conspiracy. They then have to show

that somebody, one of the conspirators—it doesn't have to be Pelfrey or even anybody on trial—committed an overt act in furtherance of the conspiracy and that it was done in furtherance of the object or purpose of the conspiracy.

Now, as a matter of practicality and as a matter of proof, there may be some trouble on the part of the Government—and I don't know this, I am just hypothesizing. The Government may have some problem linking Pelfrey to that conspiracy without that linking evidence constituting an overt act, the overt act being something that they are not permitted by the Court of Appeals opinion from showing.

So I don't quarrel with you, Mr. Croswell, that the Government might have some factual problem, but I don't think legally this is something I can rule on now, number one. And number two, I don't think this is something that I can use as a basis to sever.

Mr. Croswell, I would welcome—and I mean that sincerely—anything you have to say in response to what I have said. I am then going to ask Ms. Brinkman to comment and then I will go down the list of attorneys.

MR. CROSWELL: Your Honor, I can honestly say that I do not disagree with your position. I've requested, based upon—and I'm not arguing the severance motion. I think that your analysis of what they must prove in a conspiracy is identical to my analysis of it. I agree with everything you have said about the Thompson case, everything you have said abut the four elements of conspiracy. I have absolutely no problem with those. The—and I will agree with you that in all likelihood the only problem that could be confronted by trying these people together would be a spillover, an overlapping effect of evidence which is proved, which might tend to at least prejudice the defendants that they can't connect to the conspiracy. But I agree with you that they must connect the individual conspiracy.

But my question is and always has been, is that in—and my statement has been that I still am not on notice as to the method in which they are going to connect him to the conspiracy. They have pled merely blanketly they are going to connect him to the conspiracy. You have ruled that absent a plea of an overt act, overt acts aren't going to be proven. And I guess my only concern is that at a joint trial with six defendants, it may be easier for them to prove something that they wish to label something other than an overt act but which is actually an overt act. But I agree with your position. I have no problem with it. And I am more than happy to try the case with six defendants if that's the Court's ruling.

THE COURT: Mr. Croswell, I appreciate that, and I will go one step further. I would be willing to consider a cautionary instruction that I would give at the very beginning of the testimony as to how they are to consider the evidence that comes in vis-a-vis one or more or all of the defendants.

What I am going to ask you to do, either by yourself or maybe with some of the other attorneys, is to draft such an instruction, let Ms. Brinkman see it, and when when we have our meeting we can discuss that.

MR. CROSWELL: Very well. Thank you very much.

THE COURT: Ms. Brinkman, anything in response to what I said to Mr. Croswell before I go to the other attorneys?

MS. BRINKMAN: No, your Honor. My understanding of the four statements of the proof of conspiracy in the Thompson case is consistent with yours and that is the way we intend to prove the case. As you said, there will be much background evidence on the conspiracy and there will be a substantial amount of evidence on the joining or the connection between individual conspirators in this conspiracy which will not constitute overt acts. The overt act is something different.

THE COURT: Ms. Brinkman, thank you.

Jim Lagos, anything on thie severance matter?

MR. LAGOS: Judge, I want to make a couple of comments. First of all, I don't want to put words in your mouth. I'm not sure. You correct me if I do so. But if I understand what you have said then, for example, against Defendant Hall, the only evidence that the Government would be permitted to use against Hall would be the comments made in Count 1 that he gave money to a certain individual and the testimony concerning the telephone conversation he made on this telephone count on the actual count that he is charged with. And then the only evidence usable against Kenneth Chamberlain would that be—there's nothing mentioned in the conspiracy count against him—would be the two telephone conversation that he is charged with insofar as using communication facilities and for the purpose of furthering—for purposes of violating the drug laws of the United States. Is that correct or is that—

THE COURT: Mr. Lagos, that is pretty close. You are correct, in that I said that is the only evidence of overt acts that will be admitted. Now, they can prove his involvement in the conspiracy in other ways. They can do it through circumstantial evidence. They can do it through a myriad of factors. So I don't want you to think that this is the only evidence that will be offered against your client. It's the only evidence of overt acts.

Now, your logical questions is probably: Well, what the heck is the difference. When we have our meeting, I am going to require Ms. Brinkman not to divulge her entire case but simply to be prepared to explain to us, so we can begin to conceptualize the difference, exactly what the difference is between proof of overt acts, additional overt acts being forbidden by the Court of Appeals—

MR. LAGOS: Judge, if I could just ask a fast question. Not to belabor the point—

THE COURT: Mr. Lagos, don't interrupt me, because I am trying to make a record.

MR. LAGOS: Okay. I'm sorry, Judge.

THE COURT: I am going to ask Ms. Brinkman to explain to us not what her evidence is going to be, but I am going to ask her to be specific enough so that she can help us conceptualize the difference between proof of additional overt acts which are forbidden by the Sixth Circuit and a means of tying a given defendant into the conspiracy without that additional evidence being considered to be overt acts.

So, Ms. Brinkman, if you would, come to our meeting prepared to do that.

MS. BRINKMAN: I will do that, Judge.

THE COURT: All right. Mr. Lagos, now your point.

MR. LAGOS: Judge, the position I have taken all along is I was willing to stipulate the conspiracy, that a conspiracy existed, just that my people weren't part of it. And I'm not sure how that can be done now, since there are three other attorneys involved in the case. And I don't know what their position would be on that if I was go get up and tell the jury, ladies and gentlemen of the jury, I concede the fact that there was a conspiracy, I'm just saying my people weren't part of it.

At that point, then, what—the only evidence that the state could use or the Government could use against my clients would be what was specifically mentioned in the indictment?

THE COURT: Mr. Lagos, I don't want to take the Government's position. I would have to think that out. But it's not enough for the Government to show that a conspiracy existed. I think they have to show that your client was part of it, in other words, that he willfully joined the conspiracy. And I don't think you would be willing to stipulate that. So I guess what I am trying to say is I don't think your stipulation accomplishs anything. It may. And you may want to talk to Ms. Brinkman and the other attorneys about this. It may shorten some of the Government's proof, but it certainly doesn't eliminate the need for it, at least my initial reaction.

Mr. Lagos, anything else?

MR. LAGOS: No. That's fine. Thank you, sir.

THE COURT: Mike Carey?

MR. CAREY: Yes, sir?

THE COURT: Any comment on the motion to sever?

MR. CAREY: No, sir. If I could simply join in Scott Croswell's comments, I would have no additional comments. I understand your ruling. I simply think that you have expanded the ruling beyond the limits of the decision of the Court of Appeals, but I do understand your reasoning and I am ready to go to trial.

THE COURT: Okay, Mr. Carey, thank you.

Marcus Carey, anything?

MR. CAREY: No comment other than those made by Mr. Croswell, your Honor. I join in his position.

One further thing, though, as a matter of—

THE COURT: Mr. Carey, we can't hear you. I'm sorry. You said something to Jerry when you called?

MR. CAREY: Yes. As I mentioned to him when the phone call was placed, I am in the middle of a trial that was to start again today at ten o'clock, and I am now fifteen minutes late for that. With the Court's permission, I would like to terminate this call and go over to the court house. I have had an opportunity to call and tell them that I am going to be late.

THE COURT: Let's see. Hold for just a second. Let's set a date to meet again and then we will let you get off the phone.

We are starting on the 16th, am I correct, or is it the 23rd?

MS. BRINKMAN: The 16th right now, your Honor.

THE COURT: All right. We have some odds and ends I think that we ought to discuss in person. And I am wondering as to your availability—this will be in the nature of a final pretrial conference and everything else. Hold for just one minute.

APPENDIX B

PARTIAL TRANSCRIPT OF
PROCEEDINGS

APRIL 5, 1984

THURSDAY AFTERNOON SESSION,
APRIL 5, 1984

PROCEEDINGS IN CHAMBERS:

. . . . .

THE COURT: Okay. Let's talk for a moment—well, let's not talk for a moment.

Ms. Brinkman, we had a talk last week and we said that you are limited to the overt acts set forth in the indictment, plus you can also use a substantive count as an overt act, since the defendants had notice of that. The defense counsel don't agree with that, and I respect that position, but that's the ruling. But one of the things we asked you was to give us an example of an act of a defendant that constitutes the joining of the conspiracy that is not also an overt act. And you promised us that you would do so.

MS. BRINKMAN: Okay. I don't recall that I was asked to give an example but you certainly did ask for my position on how the Court was to determine what evidence was being admitted as proof of an overt act as opposed to evidence that was being admitted as proof of other aspects of the conspiracy.

And after reading the Thompson case again, my conclusion is that if evidence does constitute proof of the agreement or the joinder of the defendant to the conspiracy agreement, it should be admitted for that purpose. I think it will simply have to be up to the Court to decide, when an objection is raised, whether the evidence should be admitted because it goes to one or the other aspect of the conspiracy other than an overt act. To rule otherwise and say all evidence is of an overt act would mean that when we were asked to file the bill of particulars with all the overt acts, we were really being required to disclose all our evidence.

I'm sorry, that's—I can't offer anything any more concrete than that. There's no case law on such a question. I don't know that the question has arisen before. My suggestion and my position is that the Court will simply have to determine as the evidence is sought to be admitted, and when there is an objection, whether it is properly admitted on the aspects of the Thompson four-prong proof of a conspiracy that doesn't constitute an overt act.

THE COURT: In other words, let's assume that you establish a conspiracy and let's assume that you are trying to link one of Mr. Croswell's clients with that conspiracy, and there's evidence that he picked up a package of marijuana and took it down the street to someone else. That can be evidence, circumstantial evidence, of joining the conspiracy, which is permitted, or it can also be evidence of an overt act, which is not permitted because of the appellate court's ruling.

You are nodding in agreement. So what you are saying is that if I admit that, as you feel I have to, I should tell the jury, in effect, "Jury, this evidence is admitted only as evidence that Mr. Croswell's client joined the conspiracy, not as an overt act taken in furtherance of the conspiracy." You are suggesting that that limiting instruction be given; am I correct?

MS. BRINKMAN: No, I am not suggesting that that limiting instruction be given, because Thompson requires that the Government prove by—one of the enumerated overt acts in the indictment be proven and that it be shown that an overt act was in furtherance of the conspiracy. It doesn't, as you said last time, have to be an overt act committed by one of the defendants who are at trial.

THE COURT: All right. Then you are suggesting that none of this other evidence be admitted as overt acts?

MS. BRINKMAN: Right, that it simply be admitted as evidence on the aspects of the conspiracy that are the agreement and the joining of a particular defendant to the agreement.

THE COURT: Okay. That may be the right answer. I don't know. That's going to be awfully tough to get a jury to compartmentalize thinking like that.

Mr. Croswell, what do you think?

MR. CROSWELL: Well, your Honor, what I think is all these problems have been created by the Government's absolute refusal to file a bill of particulars in this case. They have not properly defined the conspiracy. They could have done that by way of a bill of particulars. They couldn't even give a bill of particulars which said there are several conspiracies within this and here's our burden of proof and here's what you have to defend. They refused to do that. They then refused to give overt acts. Now what they want to do is to come in this courtroom and look at the Court, Judge, you have outlawed overt acts and we stand by that, the Sixth Circuit is with you. So we are going to prey on the minds of the jury, we are going to put every bit of that stuff in that we refused to give per your order, but we are going to call it something else. We are going to call it intent on the conspiracy. We are just going to call it general information that the jury should consider.

The whole problem that I had with this case from the outset is that we have never understood what we are charged with. And in addition to that, you have a problem of poisoning the minds of a jury by bringing in thousands of pieces of information about not only my client but everyone else. And that's what we are attempting to do. It's this very thing, I know that is exactly the very thing they would do to come in and call an overt act something other than an overt act. And I obviously object.

THE COURT: I know you do. Let's assume for sake of argument that these problems are caused by the Government's position that they took—but that's irrelevant at this point—what is your suggestion?

MR. CROSWELL: My suggestion is that, number one, they follow the Thompson case, they be forced to prove the conspiracy that they pled in the indictment

before they prove the defendants link, that when they prove the defendants link, they had to have pled the defendants link to the conspiracy. All my—my only suggestion is, you filed the seventh pretrial order and the seventh pretrial order said not only do they have to give overt acts but they had to plead the link to the conspiracy. And if they can't prove the conspiracy that they have charged in the indictment, they can't get to the link of the indictment, they can't get all the hearsay in they are trying to get in and they can't get in all the inferences. They are going to continue to have problems throughout the entire case unless and until they prove the conspiracy they have charged in the indictment, not 35 other independent conspiracies but the one we are here to defend. And my position is all the Court has to do to clean this whole thing up is make them prove the conspiracy she pled in the indictment and make her prove it with the overt acts that she was kind enough to give us. That is what her testimony is limited to.

THE COURT: What you are basically saying is that in this case the Court ought not to follow—the Vincent case, which basically says that in a conspiracy case, you don't have to prima facie prove the conspiracy first before anything else comes in. Vincent would allow evidence to come in at the prosecutor's discretion subject only to bearing the risk of not showing all the elements at the time the Government rests its case. But you are saying that because of the unique procedural posture of this case, I ought to go back to requiring her to prove initially the prima facie existence of the conspiracy before going to the next step, in other words, it ought to be in a logical progression?

MR. CROSWELL: Absolutely. That's the only thing that is logical. We still—I can honestly say, as I sit here today, I do not know what I am expected to defend on April 16th. I can only presume that I am defending a forty-man conspiracy indictment that falls within two years.

Now, if she wants to come in and prove things—I don't know what she is going to

prove or what she can prove, because she has not told anyone and she has not put them on notice. But what she can't do is come in here and prove 35 illegal acts that has got nothing to do with the conspiracy and try to taint the jury's mind to make them look and say, well, you know, these are bad people so we will convict them whether the evidence conforms to the indictment or not. All these problems.

MS. BRINKMAN: May I respond?

THE COURT: Please, when he is done.

Mr. Croswell, were you done?

MR. CROSWELL: It's clear, it's clear where I stand. I just—the Court made a ruling, and I think it would be extremely unfair, and I think, with all due respect, we have all wasted a lot of time if they can go behind that ruling for other things other than overt acts. They only need one overt act, they don't need to prove the 55. There is no point in the Court ordering that they enumerate the overt acts, when they only need one. The point of them making them enumerate the overt acts was to give us notice. Now they will come in and lable them something else and attempt to enter them into evidence.

I think my case and the evidence against my client is clearly stated, for again Mr. Heberlin, right in the indictment they are tied to the allegations in the first count, that there is a forty-man conspiracy, that that forty-man conspiracy existed. I am not here to defend a conspiracy other than that. If they want to prove a conspiracy other than that, what she should do is dismiss this indictment and indict under a conspiracy that they can prove, let me know what it is they wish to prove, what I am defending. And I'm just asking the Court to hold the evidence to that.

THE COURT: Ms. Brinkman?

MS. BRINKMAN: Number one, we intend to prove the conspiracy that is set forth in Count 1. All this speculation that Mr. Croswell is raising that we won't be proving that conspiracy but another one is entirely speculation.

Number one, according to the Thompson case, there is a difference between the overt acts that must be proved and which must be shown to be in furtherance of the conspiracy and the other elements of proving the conspiracy, that is the agreement and that is the joinder of the defendant to the agreement.

Even under the Vincent case, if a mini trial were held and the conspiracy were proven first, the involvement of a particular defendant who is going to trial in this conspiracy would come out through the evidence. The conspiracy would not be proven in a vacuum with no reference to the defendants who were on trial in the case. So the evidence would obviously come in before the jury on proof of the conspiracy that would concern the individual defendants at trial.

So I don't understand the distinction, this kind of arbitrary distinction that is being made, and the suggestion that the Court's decision on how to prove the conspiracy during the course of the presentation of evidence in the trial—I don't know why it is such a big problem.

MR. CROSWELL: It's not a matter of distinction, it's a matter of notice. The issue is notice here, the issue is not an overt act versus a substantive act. The issue is notice.

And in addition to that, I don't understand how you can possibly sit here and say to me you believe you will prove an overall conspiracy, when to begin with you didn't charge the man with that very conspiracy and all you had to do was prove he conspired with one member in there. That gives you the position that all you have to do is to try all forty of these individuals and come into court and say, Judge, today is the day we are going to prove real conspiracy.

In other words, they come in and they sit today. They have tried this conspiracy, this forty-man conspiracy today on the theory that it existed only between Kahelin and Terry and that that was sufficient. I sit here today and say that they have not proven the overall conspiracy. It places

them. But they say he doesn't know what they are going to prove, we will prove it tomorrow. And what I'm saying is that gives them the opportunity to take the very same charging indictment, the very same notice to each of the forty different individuals, and come in in forth separate trials, prove forty separate conspiracies and have their explanation each time be, Judge, today is the day we are going to prove the real conspiracy which was charged.

.　.　.　.　.

THE COURT: First of all, Ms. Brinkman, any more response, and then we will move on?

MS. BRINKMAN: One point. And, Mike, I hope you can hear me. It seems to me from my research, that the question of whether the Government has engaged in its production of proof in any variance from the indictment is an appellate question or at least a question for considering after the Government has presented its proof. And all this discussion now about whether the Government is going to prove the conspiracy as it alleged or is going to request an instruction on a conspiracy that is different than the one in the indictment is premature.

THE COURT: I don't disagree with what Ms. Brinkman says generally, but that still does not address the central issue. And you are simply going to have to brief it for me. And the central issue is this: Keeping in mind—and I don't have it in front of me, but my order to her that sparked the appellate process was that she was going to be limited to the overt acts set forth in the indictment. I did not say—perhaps I should have, but I did not say that she was limited as evidence to what's set forth in the indictment.

Now, what she is saying is this: That she doesn't expect to introduce any more overt acts other than as set forth and, besides, it's no big deal because all she has to do is prove one committed by any of the conspirators, not even the people on trial. And she is saying she can bring in—

Michael, are you there? I am hearing an awful lot of static.

MR. CAREY: Yes, your Honor, I am.

THE COURT: She is saying she can bring in whatever evidence she has, not as overt acts but simply as evidence of the formation of the conspiracy and a willful joining of the conspiracy. And she is saying that that is not blocked by either my order or the appellate court decisions.

Now, whether you like that position or not, it is clearly stated and, frankly, it forms the basis of briefing. And this is something that we dare not start the trial without resolving. I am going to have to make a decision one way or the other and, you know, we are going to have to live with it until, if necessary, the appellate process.

So, Mr. Croswell, even if you can't have your brief in until Wednesday, this is important enough to me that you have got to address it. And if any other defense counsel wants to address it, that's fine.

And, Ms. Brinkman, don't take this as my being facetious or snide, but you have got to give me some law above and beyond "the government has the right to do this." Give me some case law if you can find some. The question that I have, that I really don't want an answer to, is if that's the Government's position—and I respect that, but if that's the Government's position, why do we spend eight months in the Sixth Circuit arguing about something that really isn't going to make any difference anyway. That may be a matter of internal office decisions that I shouldn't be privy to anyway, but it's, frankly, a question that sometime I would like to have answered just to satisfy my own curiosity.

I don't think we can do any more on this issue at this time. We have framed the issue and I need memoranda on it.

Okay. Let me move on, if I can. Let me talk about voir dire examination and how we are going to do it.